# STATE OF CONNECTICUT *v.* ROBERT ROBERTSON
## (SC 15877)

McDonald, C. J., and Katz, Palmer, Sullivan and Vertefeuille, Js.

Argued May 24—officially released October 17, 2000

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Susann E. Gill*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Cornelius P. Kelly*, assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, C. J. The defendant, Robert Robertson, appeals from the judgment of conviction, rendered after a jury trial, of accessory to murder in violation of General Statutes §§ 53a-8 and 53a-54a,[1] and conspiracy to

[1] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . ."

General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . .

"(c) Murder is punishable as a class A felony . . . ."

commit murder in violation of General Statutes §§ 53a-54a and 53a-48 (a).[2] On appeal,[3] the defendant argues that the trial court improperly: (1) allowed statements of a codefendant to be used against him pursuant to the coconspirator exception to the hearsay rule; (2) admitted into evidence against the defendant audiotapes of telephone conversations made from jail during trial and failed to instruct the jury properly as to the use of the transcripts of those audiotapes; (3) denied the defendant's motion to sever his trial from that of his codefendant; (4) questioned witnesses; and (5) denied the defendant's motion for acquittal based on insufficient evidence of an intent to kill. We reject the defendant's claims and affirm the judgment of conviction.

This case is the companion to *State* v. *Bush*, 249 Conn. 423, 735 A.2d 778 (1999), where we stated: "The jury reasonably could have found the following facts. On September 25, 1993, the victim, Norman Jones, a member of the Brotherhood street gang, was . . . at a party in Bridgeport. Antoin Pettway also was present at the party. At some point during the evening, the victim and Pettway left the party together and went to the Pequonnock housing project, where Pettway had an apartment. Upon arriving at the housing project, Pettway entered his apartment building. The victim, who did not live at Pequonnock, remained directly outside the building's front entrance.

---

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[3] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

"Pettway encountered [the defendant], a member of the Bush Mob gang, in the building's lobby. [The defendant] asked Pettway if the person outside the building's entrance was [the victim], and Pettway responded affirmatively. Both men then left the lobby. [The defendant] entered the stairwell and went upstairs, while Pettway took the elevator to his apartment.

"Shortly thereafter, [the defendant] and [Dion Bush], who also was a member of the Bush Mob gang, entered the lobby from the stairwell. The two men, each of whom was armed with a handgun, then went to the building's front entrance and pointed their guns in the direction of the victim. [The defendant] diverted his aim from the victim and fired once into the air. [Bush], however, fired several rounds at the victim, stopping only when his gun had been emptied. As [Bush] and [the defendant] then retreated through the lobby, Bernard Johnson, who had been in the lobby at that time, asked them why they had shot at the victim. One of the two men responded that they had done so to retaliate for the recent murder of a Bush Mob gang member.[4]

"Within minutes, Bridgeport police officers arrived and found the victim lying on the ground a short distance away from the entrance of the building. He had been shot once in the back and was unconscious. He subsequently was transported to Saint Vincent's Medical Center in Bridgeport, where attempts to save his life proved unsuccessful." Id., 425–26. Additional facts and procedural history will be provided as necessary.

I

The defendant claims that the trial court improperly permitted the jury to consider a dual inculpatory state-

---

[4] A member of the Bush Mob gang, identified at trial only as Two-Tone Timmy, previously had been killed, allegedly by a member of the Brotherhood gang. There was testimony at trial that one of the shooters had stated: "You kill one of our brothers, we return and kill one of their brothers back."

ment that Bush had made to Maria Caban the day after the murder. He argues that the jury's use of this evidence against him violated his rights under the confrontation clauses of the federal and state constitutions. U.S. Const., amend. VI; Conn. Const., art. I, § 8.[5] We disagree.

The following additional facts are relevant to the resolution of this claim. Caban testified at trial that, around the time of the murder, the Bush Mob frequently held meetings and stored clothing and guns in her Pequonnock apartment and that both Bush and the defendant spent time in her apartment. She testified that, the day after the shooting, she had a conversation with Bush in which he admitted that he had "empti[ed] out a gun on [the victim] outside of the building." Bush also told Caban that the defendant was present during the shooting and that the defendant had fired the first shot into the air. Bush stated that the defendant then "punked out," meaning that he became frightened and did not fire any more shots. Caban also testified that Bush told her that the gun used to kill the victim was in her apartment. Bush stated that he planned to leave town, and that Caban would not see him for a while. Caban testified that, several days later, members of the Bush Mob removed the gun from her apartment. Thereafter, Caban did not see any of the male members of the Bush Mob for some time.

The defendant objected to the admission of the statement. The trial court admitted Caban's testimony but cautioned the jury that Bush's statements could not be

[5] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

The constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions, the accused shall have the right . . . to be confronted by the witnesses against him . . . ." In the absence of an independent state constitutional analysis, we limit our review to the defendant's federal constitutional claim. See *State* v. *Pinder*, 250 Conn. 385, 389 n.4, 736 A.2d 857 (1999).

used against the defendant at that time.[6] At the end of the trial, the court charged the jury that Caban's testimony could not be used against the defendant unless the jury found that a conspiracy existed.[7] The defendant took exception to the trial court's charge.[8]

[6] The trial court instructed the jury as follows: "Let me make a ruling here so we don't have a problem throughout. This is a charge of murder. This is a charge of conspiracy to commit murder. I'll tell the jury if there are statements to be admitted into evidence having been spoken from the witness that they are the statements of Bush and those statements on the charge of murder at this time cannot be used against the defendant Robertson. But since they are charged with conspiracy to commit murder, statements of either one may be used as probative value in respect to the other defendant as well if you are satisfied, and that won't come until you are given the case, that there was a conspiracy and that these people participated knowingly in conspiring to commit the crime of murder, if you find that, and an overt act had been completed in furtherance of it, then you may consider any statements made by any members of the conspiracy.

"Now, I don't know what you are going to find later on, but just be cautious. And when you are listening [to] the statements that apply to Bush, they remain with him for the time being. Okay."

[7] The trial court instructed the jury as follows: "[D]uring the course of trial certain evidence was admitted for you to consider in the case of one of the accused but you were instructed that this particular evidence was not to be considered by you in connection with charges against the other accused. Reference is therefore being made to the statement that Mr. Bush was alleged to have made to Maria Caban, and she testified as to what he allegedly said to her, which included a reference to the codefendant in respect to the charge of murder. It was originally objected to and I allowed it to be offered with the caution at that time that you'll consider it only against Mr. Bush and not against [the defendant].

"I tell you now in regard to the conspiracy charge that any statement made by any coconspirator, if you find that there was proven beyond a reasonable doubt, an agreement between these two men to commit the act of murder in respect to the victim in this case. If that agreement is [viable] and there's a[n] overt act that has taken place in furtherance of the agreement, to wit, the shooting and killing of the young man outside, then any statement made by any coconspirator is admissible against all participants in the crime."

[8] The defendant argued: "Your Honor, I—just to—for the record, to suggest that our position is that Bush's statements are not statements in furtherance of the conspiracy, but, rather, in the nature of admissions and confessions and not in furtherance of the conspiracy, and so therefore should not be used as against [the defendant]."

Later, the defendant stated: "Finally, on the conspiracy, I just renew our

On appeal, the defendant claims that the trial court improperly permitted the jury to consider Caban's testimony against the defendant when there was no evidence that, at the time the statement was made, a conspiracy was still in existence. The defendant argues that, at the time of Bush's conversation with Caban, the object of the conspiracy, the victim's death, already had been achieved. Furthermore, the defendant argues that there was no evidence that Bush's statement was made in furtherance of the conspiracy, as Bush did not ask Caban to take any action to aid the conspiracy. We disagree with the defendant's claims.

"It is well established that a coconspirator's [hearsay] statement, made while the conspiracy is ongoing and in furtherance of the conspiracy, is an exception to the hearsay rule and as such, does not violate the confrontation clause." (Internal quotation marks omitted.) *State v. Booth*, 250 Conn. 611, 634, 737 A.2d 404 (1999), cert. denied sub nom. *Brown v. Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). In order to invoke the coconspirator exception to the hearsay rule, "[t]here must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made during the course and in furtherance of the conspiracy." (Internal quotation marks omitted.) *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987). "The court must make its preliminary determination by a fair preponderance of the evidence . . . ." (Citation omitted; internal quotation marks omitted.) *State v. Vessichio*, 197 Conn. 644, 655, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986). "A finding as to whether or not a proffered

objection and suggest that what we're claiming is that these statements by Mr. Bush were not in furtherance of the conspiracy, but were, rather, confessions by him and therefore it should not be used against [the defendant] as to the conspiracy charge."

statement was made in furtherance of the conspiracy . . . will not be overturned on appeal unless it is clearly erroneous." *United States* v. *Thai*, 29 F.3d 785, 814 (2d Cir.), cert. denied sub nom. *Lan Ngoc Tran* v. *United States*, 513 U.S. 977, 115 S. Ct. 456, 130 L. Ed. 2d 364 (1994); see also *United States* v. *Diaz*, 176 F.3d 52, 83 (2d Cir.), cert. denied sub nom. *Rivera* v. *United States*, 528 U.S. 875, 120 S. Ct. 181, 145 L. Ed. 2d 153 (1999) (reviewing preliminary determination of admissibility for clear error); *United States* v. *Shores*, 33 F.3d 438, 444–45 (4th Cir. 1994), cert. denied, 514 U.S. 1019, 115 S. Ct. 1365, 131 L. Ed. 2d 221 (1995) (employing clearly erroneous standard to finding that statement was made in course of and in furtherance of conspiracy); *United States* v. *Mayes*, 917 F.2d 457, 464 (10th Cir. 1990), cert. denied, 498 U.S. 1125, 111 S. Ct. 1087, 112 L. Ed. 2d 1192 (1991) (time at which conspiracy ends is factual finding, subject to clearly erroneous standard); *United States* v. *Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1198–99 (2d Cir.), cert. denied sub nom. *Lavery* v. *United States*, 493 U.S. 933, 110 S. Ct. 324, 107 L. Ed. 2d 314 (1989) (finding that statement was made in furtherance of conspiracy not reversible unless clearly erroneous); *United States* v. *Monroe*, 866 F.2d 1357, 1363 (11th Cir. 1989) (same); *United States* v. *Posner*, 764 F.2d 1535, 1537 (11th Cir. 1985) (same).

We conclude that there was sufficient evidence that the conspiracy was ongoing when Bush made the statement to Caban. "[A] conspiracy does not necessarily end with the commission of the target crime. Thus, a subsequent declaration of a conspirator may be admissible against any coconspirator . . . if the conspirators were still concerned with the concealment of their criminal conduct or their identity . . . ." (Internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 635. In *State* v. *Booth*, supra, 661–62, we held that a statement made by one coconspirator to a third party three days

after the murder had taken place was admissible against all three conspirators, because there was evidence that the conspiracy was ongoing. The *Booth* conspirators were jointly concocting alibis at that time. Id., 661. In *State* v. *Couture*, 218 Conn. 309, 323–24, 589 A.2d 343 (1991), we held that a coconspirator's statement to a third party while the conspirators were transporting stolen money to a safe hiding place was admissible against another conspirator because the object of the conspiracy, successfully to steal the money and conceal it from detection, had not been accomplished at that time. See also *United States* v. *Medina*, 761 F.2d 12, 18 (1st Cir. 1985) ("the conspiracy continued so long as the conspirators were acting together to destroy incriminating evidence").

Similarly, in the case at hand, the conspiracy did not end with the victim's murder. There was evidence that the conspirators were taking actions to conceal the murder weapon and hide their identity from the police at the time that Bush spoke with Caban. Caban testified that Bush told her that the gun used in the murder was in her apartment. She also stated that, several days after the murder, members of the Bush Mob removed the gun from its hiding place. Furthermore, Bush told Caban that he would be leaving town soon. Thereafter, she noticed that no male members of the Bush Mob were around her apartment for some time. The actions to conceal and dispose of the murder weapon and to escape detection for the crime reasonably may be construed as part of the original conspiracy to murder the victim and escape detection.

The defendant argues that, according to *Krulewitch* v. *United States*, 336 U.S. 440, 69 S. Ct. 716, 93 L. Ed. 790 (1949), a conspiracy ends with the commission of the target crime and does not include subsequent acts to conceal the crime. We agree with the defendant that "after the central criminal purposes of a conspiracy

have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment." *Grunewald* v. *United States*, 353 U.S. 391, 401–402, 77 S. Ct. 963, 1 L. Ed. 2d 931 (1957). However, "[b]y no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy. . . . [A] vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained . . . ." Id., 405. We conclude that the Bush Mob's actions, taken within hours of the murder, to hide and dispose of the murder weapon and conceal the identities of the killers were part of the conspiracy to murder the victim rather than independent subsequent acts intended to cover up the crime. The cases cited by the defendant are therefore distinguishable. See *Krulewitch* v. *United States*, supra, 336 U.S. 442 (statement made one and one-half months after crime not during course of conspiracy); *United States* v. *Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993) (threats made to informant by coconspirators more than three months after their arrest not during course of conspiracy); *United States* v. *Serrano*, 870 F.2d 1, 9 (1st Cir. 1989) (statement at deposition more than eight months after crime not during course of conspiracy); *United States* v. *Vowiell*, 869 F.2d 1264, 1267 (9th Cir. 1989) (statement made four days after crime not during course of conspiracy).

We also conclude that there was sufficient evidence to support a finding that Bush's statement was made in furtherance of the conspiracy. "[T]he 'in furtherance' term implies . . . [that] the statements must in some way have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy, as

by, for example, providing reassurance to a coconspirator, seeking to induce a coconspirator's assistance, serving to foster trust and cohesiveness, or informing coconspirators as to the progress or status of the conspiracy . . . or by prompting the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity . . . ." (Citations omitted.) *United States* v. *Tracy*, supra, 12 F.3d 1196. "Statements made by a co-conspirator to a third party who is not then a member of the conspiracy are considered to be 'in furtherance' of the conspiracy if they are designed to induce that party either to join the conspiracy or to act in a way that will assist it in accomplishing its objectives . . . ." (Citations omitted.) *United States* v. *Shores*, supra, 33 F.3d 444; see also *United States* v. *Beech-Nut Nutrition Corp.*, supra, 871 F.2d 1199 (statement made to third party to reassure and encourage not to reveal incriminating information was "in furtherance" of conspiracy).

In *State* v. *Pelletier*, 209 Conn. 564, 577–78, 552 A.2d 805 (1989), we observed that "[one coconspirator] indicated that he wanted to tell [his wife] about the shootings before she heard about it on the news. We view this statement as relevant to the furtherance of the conspiracy. [The coconspirator's] statement was made to lessen any emotional trauma the killings would cause [his wife], whose house was being used to hide the stolen property and whose further cooperation was obviously necessary. The clear implication is that this statement helped to maintain the cohesiveness of the conspiracy thereby furthering its purpose."

The defendant argues that Bush's statement was merely a confession of guilt made to a friend. He points to the fact that Bush described past events to Caban and did not specifically ask her to take any action on his behalf. The defendant claims that this conversation necessarily was only " '[a] casual admission of culpabil-

ity' "; *United States* v. *Eubanks*, 591 F.2d 513, 520 (9th Cir. 1979); that " 'spilled the beans' "; *United States* v. *Posner*, supra, 764 F.2d 1538; and did not further the conspiracy. We reject this argument.

There was evidence adduced at trial that Bush confided in Caban about the murder in order to induce her continued cooperation with the Bush Mob, of which the defendant and Bush were members. Caban was someone trusted by the Bush Mob, and she had assisted them in the past. She had permitted the gang to meet at her apartment and store weapons and clothing there. Her further support and cooperation were required to hide the murder weapon in her apartment. It was reasonable to conclude from the evidence that Bush told Caban about the murder and the Bush Mob's involvement to ensure her continued cooperation and silence. The law does not require a conspirator to ask a third party expressly to do something to further the conspiracy in order for the statement to be admissible under the coconspirator exception to the hearsay rule. See, e.g., *United States* v. *Shores*, supra, 33 F.3d 444–45; *United States* v. *Mayberry*, 896 F.2d 1117, 1121–22 (8th Cir. 1990); *United States* v. *Herrero*, 893 F.2d 1512, 1528 (7th Cir.), cert. denied, 496 U.S. 927, 110 S. Ct. 2623, 110 L. Ed. 2d 644 (1990); *United States* v. *Beech-Nut Nutrition Corp.*, supra, 871 F.2d 1199; *United States* v. *Monroe*, supra, 866 F.2d 1363; *United States* v. *Shoffner*, 826 F.2d 619, 628 (7th Cir.) cert. denied sub nom. *Stange* v. *United States*, 484 U.S. 958, 108 S. Ct. 356, 98 L. Ed. 2d 381 (1987). Instead, "[t]he standard to be applied is whether some reasonable basis exists for concluding that the statement furthered the conspiracy." (Internal quotation marks omitted.) *United States* v. *Shoffner*, supra, 628. We conclude that a reasonable basis did exist, and that there was no impropriety in permitting Bush's statement to be used against the defendant under the coconspirator exception to the hearsay rule.

## II

The defendant also claims that audiotapes of telephone calls that he and Bush had made from jail during the trial should not have been admitted into evidence because they were irrelevant, and because their prejudicial effect outweighed their probative value. He argues that the trial court improperly failed to instruct the jury, sua sponte, that the transcripts of the tapes were not to be considered as evidence. Lastly, the defendant argues that the three audiotapes of Bush's telephone calls from prison should not have been used as evidence against the defendant. We disagree with the defendant's claims.

The following additional facts are relevant to these claims on appeal. During the first day of trial, Johnson testified that he could not identify the shooters because they were wearing masks. Johnson also testified that his earlier statement to police that Bush and the defendant were the shooters was a lie. When court ended for the day, Johnson was still on the stand, and the state indicated that it would call him as a witness again the next day.

That evening, the department of correction taped three telephone calls that Bush made from jail. In one conversation, Bush told an unidentified male that "[s]hit went smooth today," and the male responded, "Yo, I did that for you man, with that kid man, B.J." Johnson's nickname was B.J. The male then continued: "I went and seen that bitchless bitch from the (unintelligible) last night, and told that bitch, you know what I'm saying . . . [t]old that bitch man, you shut up motherfucker." In the second telephone call, Bush told an unidentified female "you got to go and check that Little [racial slur] out." Caban's nickname was Little Maria. Bush explained that if Little was "straight," he could come home after the trial, and the female responded, "Yeah,

she's straight then. Definitely straight." In the third telephone call, Bush told an unidentified male that "she" is supposed to tell him about Little. He told the man either to ride over to "her crib" or call her, adding "[j]ust make sure them [racial slur] do everything I say."

The correction department also taped one telephone conversation that the defendant had with an unidentified woman that same night. On the tape, the defendant told the woman: "Dion said to call that number that I called the other night again."[9] With the defendant on the line, the woman called the number and another female answered the telephone, completing a three way call. The defendant told the second woman that Johnson was "helping us," and that someone should talk to him "some more." The defendant then told the woman that "we" are looking for Darcell Daniels, Caban's roommate, and that "we" need to find her "[c]ause Maria (unintelligible) lying and shit."

At trial the next day, Johnson testified that, prior to the trial, someone had approached him regarding his testimony in this case. When asked if he was concerned about his safety with respect to testifying, Johnson answered, "I don't want to be here." Inspector William Graham of the state's attorney's office later testified that he had met with Johnson a few days before Johnson's testimony. Graham stated that Johnson had told him that his previous statement to police was accurate, but that he could not testify as to the identity of the shooters at trial because he was concerned about his safety.

Later that same day of the trial, Caban failed to appear to testify as scheduled. She was arrested under a capias, jailed overnight and testified the following day. When Caban took the stand, she stated that she was afraid

---

[9] On appeal, the defendant argues that, on the tape, he asked: "[D]id you call that number I told you to call the other night?" See footnote 13 of this opinion.

to testify because people had contacted her and told her to change her story. Caban also testified that she had spoken with the defendant since his incarceration and that a friend known as Junior had initiated a three way call with the defendant and Caban, during which the defendant asked if "they" had contacted her yet. Caban answered that she did not want to talk about it and the conversation ended. A few days before Caban's scheduled testimony, a woman named Tasha called her and told her to change her story. Caban stated that Tasha also called Johnson and that, on a three way conference call, they all discussed whether Caban and Johnson were required to go to court. Caban testified that Johnson assured the woman that they both had to appear in court. During this call, Caban heard someone in the background say the name Angie. Caban testified that she knew that Angie was a relative of Bush's— either his sister or his cousin. Later that same night, a man named Warren, whom Caban had met through the defendant and Bush, approached her and spoke with her about her testimony. Warren told her that, unless she lied, Bush would have to spend many years in jail. Caban also testified that, on the day of her scheduled testimony, she was walking to the courthouse when she recognized some people gathered outside a restaurant. Angie was present with the group. Caban stated that, upon seeing these people, she became frightened and went to a friend's house instead of coming to court as her subpoena directed.

The day after Caban testified, the audiotapes of the telephone conversations were admitted into evidence and played for the jury. The jury also was given a transcript of the conversations prepared by Graham. The defendant objected to the admission of the three Bush tapes against him. The state argued that the conversations, together with Caban's testimony and Johnson's recanting of his police statement, indicated that Bush

and the defendant, directly or indirectly, had contacted Johnson and Caban to influence their testimony. The court responded that, at that time, the tapes were admissible only against Bush, "pending my hearing everything that is to be said." Later in the trial, the court repeated that the three Bush tapes were admissible against only Bush,[10] and that the one tape of the defendant's call was admissible against the defendant.[11] In its jury charge, the trial court referred to the tapes when instructing the jury as to consciousness of guilt.[12] The court later stated:

[10] The trial court stated: "I'm going to repeat one more time that whatever the evidence is coming in this case, you will recognize it as being attributable solely to Mr. Bush, solely, at this juncture. Even if [the defendant's] name appears, it is Mr. Bush against whom this testimony would be offered, and you may only consider it in regard to the effect it may have. And I will tell you during my instructions that it's a very limited effect having to do with a consciousness of guilt . . . "

[11] The trial court distinguished the tape of the defendant's telephone conversation from the three Bush tapes, stating: "You will recall my previous concern and instruction that the prior tapes are offered against . . . Bush, and now this tape, for the first time, I'm discussing with you a tape separate and distinct from those we have previously discussed, and this tape is being offered against the defendant . . . ."

[12] The trial court stated: "One word more about the general principle having bearing on the case at hand is a theory of law known as the consciousness of guilt. Whenever a person is on trial for a criminal offense, it is proper to show that person's conduct as well as any statements made by him after the alleged criminal offense which may be fairly—may fairly be inferred to have been influenced by the criminal act. . . .

"Evidence of threats made against a witness or attempts to influence the testimony of a witness in a criminal prosecution are generally admissible if it can be shown that there is a connection between the acts and the defendant. This connection requires that the threat or acts of intimidation against witnesses were made with the defendant, singular—each defendant has to be considered on his own—with their knowledge, consent or authorization. . . .

"You have with you evidence in the case, four tapes, that were completed by the department of correction between . . . Bush to various individuals, and there is a tape from the defendant . . . which you will consider in determining whether or not there was any attempt by either, directly or through intermediaries, to influence persons who were to appear as witnesses in this trial. . . .

"[I]f you find the defendant's act showed a consciousness of guilt, you may use that conclusion or inference as independent evidence of the guilt

"On the tapes. There are four tapes for you to play, if you like. . . . Three of the tapes, obviously, are of and offered against Mr. Bush. The fourth tape is offered against [the defendant]. But you, in your overview of all the evidence in the case, including those tapes, you will determine whether or not there are statements made in there which allow you to conclude or not that the information being given off—given by both men at different times to other people were the result of their being coconspirators in this case, or are they individually. And then examine as to whether or not the content of those tapes do in fact give you a basis to conclude that there was any act of intimidation or threat. There may or there may not be. That's up to you too." The defendant objected to this instruction, claiming that the court did not make it clear to the jury that it "may view [the defendant's] taped conversation as against [the defendant] and Bush's taped conversation as against Bush." The trial court responded, "No, I think they're both treated the same. . . . If they find there's reason to think that they're acting together in concert and, you know, based on [the defendant's] tapes, 'Bush wants you to call this number,' and it's for the mutual benefit of both to have the witnesses lie."

## A

The defendant claims that the trial court abused its discretion by admitting these four audiotapes into evidence because they were irrelevant, and because their prejudicial effect outweighed their probative value. We disagree.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with

along with other facts of the case to determine whether or not he has— either one or both has been proven guilty of any one of the crimes charged."

other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . A party is not required to offer such proof of a fact that it excludes all other hypotheses; it is sufficient if the evidence tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Citations omitted; internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 305, 664 A.2d 743 (1995).

"The general rule is that threats against witnesses are not relevant and are thus inadmissible as evidence unless the defendant is linked in some way to the making of the threats. . . . The reason for the rule is that evidence of threats against witnesses is generally admissible either on the theory that such conduct is inconsistent with the defendant's claim of innocence or on the theory that the making of such threats evinces a consciousness of guilt. . . . Obviously, if the threats cannot be linked to the defendant, evidence of such threats directed toward a witness would be of no probative value for those purposes." (Citations omitted.) *State* v. *Walker*, 214 Conn. 122, 129, 571 A.2d 686 (1990).

There was sufficient evidence here from which the jury reasonably could have concluded that the defendant and Bush were jointly involved in tampering with and intimidating witnesses. Caban testified that Warren, whom she knew through the defendant, contacted her and told her to lie on the stand. Caban also stated that she had spoken with the defendant since his incarcera-

tion. In the audiotape of his telephone conversation, the defendant states that someone "need[s]" to talk to Johnson "some more" and he mentions getting someone to talk to Caban "[c]ause Maria (unintelligible) lying and shit." The defendant also states things in the plural, claiming that Johnson is helping "us," and that "we" need to find Caban and talk to her. The defendant is also heard referring to Bush's directive that a call be made. From this evidence, the jury could have concluded that the defendant and Bush were working together to influence the witnesses' testimony against them, and the tapes were therefore relevant.

The defendant argues further that even if the evidence was relevant, the trial court abused its discretion by admitting the tapes into evidence without ever weighing whether the prejudicial effect of these tapes outweighed their probative value. The defendant argues that the prejudicial effect of admission of the three tapes of Bush in conjunction with the tape of the defendant greatly outweighed any probative value because "an overall atmosphere of a conspiracy to tamper with witnesses was created, even though the court never verified that evidence of such a conspiracy existed." We disagree.

"We have previously outlined four situations where prejudice to the defendant could outweigh the probative value of evidence. These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it. . . . We have also noted, however, that ultimately, [a] trial court has broad discretion in determining whether the

probative value of proffered evidence is outweighed by the prejudice that is likely to result from its admission. . . . We will not overturn its decision absent an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Prioleau*, supra, 235 Conn. 307. Although the tapes were prejudicial, all incriminating evidence is prejudicial. The question, rather, is whether the prejudice was unfair. It was not. We conclude that the probative value of the tapes clearly outweighs any prejudicial effect and, therefore, the trial court did not abuse its discretion by admitting this evidence.

## B

The defendant also claims that his constitutional right to a fair trial was violated when the trial court failed to instruct the jury that the transcripts of the taped telephone calls made from prison contained the state's version of the conversations and were therefore not to be considered as evidence. We disagree.

The following additional facts are relevant to this claim. After the tapes were admitted into evidence, the state offered a transcript of the conversations prepared by Graham to aid the jury. The trial court permitted the jurors to use the transcripts while they listened to the tapes. The trial court noted, however, that "[the transcript] won't be marked as an exhibit," and that the copies provided to the jurors "are just an assist to the jury. We'll collect them [from the jury] afterwards and they can have them again in deliberation." In its jury charge, the trial court instructed the jury that "[t]here are four tapes for you to play, if you like. . . . If not, I'm going to send the transcripts in anyway, so you will have those. They're not exhibits, but they are an assist for you to have a recollection of that." The defendant did not object either to the trial court's instructions, or to the submission of the transcripts during deliberations.

On appeal, the defendant argues that the trial court should have instructed the jury sua sponte that the transcripts of the tapes contained the state's version of the conversations and were therefore not to be considered as evidence.[13] Although the defendant concedes that he did not raise this issue at trial, he asserts that this claim is reviewable under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989),[14] and the plain error doctrine.[15] We disagree.

The defendant's claim clearly is not one of constitutional magnitude, and we decline to review it for that reason. Although the defendant claims that the trial court's failure to instruct the jury on the proper use of the transcripts violated his constitutional right to a fair trial before an impartial jury, "merely placing a constitutional tag on a nonconstitutional claim does not make it so. . . . *State* v. *McIntyre*, 242 Conn. 318, 329, 699 A.2d 911 (1997)." (Internal quotation marks omitted.) *State* v. *Woods*, 250 Conn. 807, 815, 740 A.2d 371 (1999). Indeed, we have stated that "it would trivialize the con-

---

[13] On appeal, the defendant asserts that the transcripts differ from the tapes in one respect. The defendant argues that where the state claims the defendant stated, "Dion said to call that number that I called the other night again," he, in actuality, stated, "did you call that number I told you to call the other night?" The defendant did not make this argument at trial. Upon reviewing the tapes, we are convinced that the transcript prepared by the state is a reasonable interpretation of the statement.

[14] In *State* v. *Golding*, supra, 213 Conn. 239–40, we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.)

[15] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

stitution to transmute a nonconstitutional claim into a constitutional claim simply because of the label placed on it by a party or because of a strained connection between it and a fundamental constitutional right." (Internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 817, 709 A.2d 522 (1998). We decline to review the defendant's unpreserved claim because it is not of constitutional magnitude.

We also conclude that the defendant's claim does not invoke the plain error doctrine. "The plain error doctrine of Practice Book § 60-5 requires a defendant to demonstrate that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. . . . We repeatedly have observed that plain error is not even implicated unless the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Citation omitted; internal quotation marks omitted.) *State* v. *Woods*, supra, 250 Conn. 814. The fairness and integrity of judicial proceedings was not implicated by the trial court's instructions permitting the jury to use the transcript as an aid. Thus, the defendant's claim does not amount to plain error.

C

The defendant also argues that the trial court improperly permitted the jury to consider Bush's taped conversations against him. He claims that the coconspirator exception to the hearsay rule is inapplicable here because Bush's conversations occurred long after the conspiracy to murder the victim had ended. The state counters that the trial court properly instructed the jury that the tapes could be used as evidence of consciousness of guilt, and that the conversations were not hearsay because they were not admitted for their truth. We agree with the state.

"A statement made out-of-court that is offered to establish the truth of the matter contained in the statement is hearsay, and as such is inadmissible. *State* v. *Blades*, 225 Conn. 609, 632, 626 A.2d 273 (1993). *State* v. *King*, 249 Conn. 645, 670, 735 A.2d 267 (1999). However, [a] statement made out of court is not hearsay unless it is offered to establish the truth of the facts contained in the statement. *State* v. *James*, 211 Conn. 555, 576, 560 A.2d 426 (1989)." (Internal quotation marks omitted.) *State* v. *Henry*, 253 Conn. 354, 364–65, 752 A.2d 40 (2000).

The truth of the statements contained in the audiotapes was irrelevant, as the tapes were offered to show consciousness of guilt.[16] "[T]he state of mind that is characterized as guilty consciousness or consciousness of guilt is strong evidence that a defendant is indeed guilty. *State* v. *Moody*, 214 Conn. 616, 626, 573 A.2d 716 (1990)." (Internal quotation marks omitted.) *State* v. *Munoz*, 233 Conn. 106, 112, 659 A.2d 683 (1995). "Courts may admit evidence of threats against government witnesses on the grounds that an effort to intimidate a witness tends to show consciousness of guilt." *United States* v. *Davis*, 154 F.3d 772, 780 (8th Cir. 1998), cert. denied, 525 U.S. 1169, 119 S. Ct. 1090, 143 L. Ed. 2d 91 (1999). Moreover, the telephone calls in this case may be considered an act in furtherance of a conspiracy, or be admissible as evidence that a conspiracy existed. *United States* v. *Garrison*, 168 F.3d 1089, 1093 (8th Cir. 1999); see *United States* v. *Roldan-Zapata*, 916 F.2d 795, 803–804 (2d Cir.), cert. denied, 499 U.S. 940, 111 S. Ct. 1397, 113 L. Ed. 2d 453 (1991) (coconspirator's statement to witness was plainly relevant to show consciousness of guilt and admissible against all defen-

---

[16] Although the trial court instructed the jury on consciousness of guilt with respect to these tapes, it did not tell the jury that the truth of the statements contained in the tapes was therefore irrelevant. Neither the defendant nor Bush requested that the jury be so instructed, however.

dants); *State* v. *Henry*, supra, 253 Conn. 365 (statement made to coconspirator was itself evidence of conspiracy, not hearsay) *State* v. *Booth*, supra, 250 Conn. 636 (same).

The defendant argues that the Bush tapes should not have been admitted against him because the conspiracy to murder the victim had long since ended. The trial court properly instructed the jury that the tapes could be used as consciousness of guilt evidence against both defendants if the jury concluded that witnesses were threatened and intimidated with the knowledge, consent and authorization of both the defendant and Bush. See footnote 13 of this opinion. We have concluded that there was evidence from which the jury could have concluded that the defendant and Bush were jointly involved in the intimidation of witnesses. All four tapes were properly used against both defendants as evidence of their consciousness of guilt.

The defendant and Bush were both on trial for the murder of the victim. The evidence produced at the trial showed that the defendant and Bush were members of the Bush Mob, a street gang. The evidence also showed that the Bush Mob was determined to kill the victim to avenge the killing of one of its members by the Brotherhood street gang, to hide the murder weapon, a handgun, to protect members of the gang from discovery, and to intimidate and silence any witnesses who could testify against Bush Mob members. This was an atmosphere of violence to which we alluded in *State* v. *McDougal*, 241 Conn. 502, 508–509, 699 A.2d 872 (1997). At the trial, Caban, although subpoenaed, failed to appear to testify and was arrested under a capias to bring her into the courtroom. Johnson did appear at court to testify but, when called to the stand, he recanted his statement to the police implicating the defendant and Bush. The state then introduced Johnson's written statement under *State* v. *Whelan*, 200

Conn. 743, 747, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). We have said that the *Whelan* principle's acceptance in our court is but a reflection of the sad reality that witnesses to violent and fearful crimes may wish to say nothing or, if they do, later say that they saw nothing. See *State* v. *McDougal*, supra, 508–509. We conclude that the record here supports the trial court's admission of the telephone tapes and its instructions as to their use against the defendant.

## III

The defendant claims that the trial court improperly denied his motions to sever his trial from that of his codefendant, Bush. The following facts are relevant to the resolution of this claim.

Prior to trial, the state moved for joinder of the trials of the defendant and Bush. The trial court granted the state's motion. During voir dire, the defendant made a motion for severance claiming that the admission of Caban's formal statement to the police and her proposed testimony would unduly prejudice him. The defendant argued that Caban's testimony was admissible against Bush but not against the defendant, and, therefore, its admission would violate his confrontation rights pursuant to *Bruton* v. *United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). The court ruled that the motion was premature, stating: "I know of no reason at the present time why both men should not be tried together. You may reserve your renewals as time goes on if the posture changes."

The defendant renewed his motion to sever several times during the trial.[17] Each time he renewed his

[17] The defendant renewed his motion to sever prior to Caban's testimony at several points during the trial, including during her testimony, during Detective Michael Kerwin's testimony concerning a police report about Caban's statements to the police and during Correction Officer William Grady's testimony concerning the audiotapes of telephone conversations from jail.

motion, the defendant objected to either the testimony of Caban, the admission of a police report regarding her statements to the police, or the admission of the three audiotapes of Bush's telephone conversations. The trial court denied his motion on every occasion.

On appeal, the defendant claims that he was prejudiced by the joint trial because the admission of Bush's hearsay statement through the testimony of Caban inculpated the defendant and violated his confrontation rights pursuant to *Bruton* v. *United States*, supra, 391 U.S. 123. The defendant also claims that there was extensive evidence against Bush, and that the "spillover" effect of this evidence substantially prejudiced his case. We disagree.

"[W]hether to consolidate or sever the trials of defendants involved in the same criminal incident lies within the sound discretion of the trial court. . . . Ordinarily justice is better subserved where parties are tried together. . . . Joint trials of persons jointly indicted or informed against are the rule, and separate trials the exception resting in the discretion of the court. . . . A separate trial will be ordered where the defenses of the accused are antagonistic, or evidence will be introduced against one which will not be admissible against others, and it clearly appears that a joint trial will probably be prejudicial to the rights of one or more of the accused. . . . [T]he phrase prejudicial to the rights of the [accused] means something more than that a joint trial will probably be less advantageous to the accused than separate trials. . . . *State* v. *White*, 229 Conn. 125, 158–59, 640 A.2d 572 (1994); accord *State* v. *Walton*, 227 Conn. 32, 56, 630 A.2d 990 (1993); *State* v. *Smith*, 201 Conn. 659, 668–69, 519 A.2d 26 (1986); see also *State* v. *Vinal*, 198 Conn. 644, 648, 504 A.2d 1364 (1986)." (Internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 620.

"A joint trial expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called to testify only once. *Parker* v. *United States*, 404 F.2d 1193, 1196 (9th Cir. 1968), cert. denied, 394 U.S. 1004, 89 S. Ct. 1602, 22 L. Ed. 2d 782 (1969). [W]here proof of the charges against the defendants is dependent upon the same evidence and alleged acts . . . severance should not be granted except for the most cogent reasons. . . . Id., 1197." (Internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 622.

The defendant's claim that the admission of Bush's hearsay statement to Caban violated *Bruton* v. *United States*, supra, 391 U.S. 123, is without merit. "[I]n *Bruton*, the United States Supreme Court held that a defendant is deprived of his rights under the confrontation clause when his codefendant's incriminating confession is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant. The *Bruton* court held that the admission of the codefendant's statements 'added substantial, perhaps even critical weight to the Government's case [against Bruton] in a form not subject to cross-examining, since [the codefendant declarant] Evans did not take the stand,' and therefore, Bruton had been denied his rights of confrontation. [Id.], 128. In *Bruton*, however, the court emphasized that it was dealing with a case in which 'the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence.' Id., 128 n.3. Several lower courts have thus concluded that *Bruton* has no application when the statements of a codefendant are otherwise admissible against the defendant. See, e.g., *Kay* v. *United States*, 421 F.2d 1007 (9th Cir. 1970) (cocon-

spirator statements); *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 303 N.E.2d 338 (1973) (spontaneous utterance); *People* v. *Gauthier*, 28 Mich. App. 318, 184 N.W.2d 488 (1970) (business record)." *State* v. *John*, 210 Conn. 652, 681–82, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989); id., 682 (*Bruton* rule not violated because statement admissible against defendant under adoptive admissions exception to hearsay rule); see *Latine* v. *Mann*, 25 F.3d 1162, 1165–67 (2d Cir. 1994), cert. denied, 514 U.S. 1006, 115 S. Ct. 1319, 131 L. Ed. 2d 200 (1995) (no *Bruton* violation because statement directly admissible against defendant); *United States* v. *Hamilton*, 19 F.3d 350, 355–57 (7th Cir.), cert. denied, 513 U.S. 986, 115 S. Ct. 480, 130 L. Ed. 2d 394 (1994) (same); *State* v. *Schiappa*, 248 Conn. 132, 159 n.32, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999) (same); *State* v. *Pelletier*, supra, 209 Conn. 577 (same); *State* v. *Haskins*, 188 Conn. 432, 452, 450 A.2d 828 (1982) (same).

We previously have concluded that Caban's testimony concerning Bush's statement properly was admitted against the defendant pursuant to the coconspirator exception to the hearsay rule. See part I of this opinion. Because the statement was otherwise admissible against the defendant, the defendant's claim that the admission of this statement in the joint trial violated the principle of *Bruton* must fail.

We also reject the defendant's claim that he was prejudiced by the spillover effect of the extensive evidence admitted against Bush. In making this claim, the defendant points to testimony from Caban about the threats she received during the trial, and testimony from Detective Michael Kerwin of the Bridgeport police department regarding an April 12, 1996 interview with

Caban regarding the victim's murder.[18] The defendant claims that this evidence was not admissible against him and was highly prejudicial. We disagree.

Caban's testimony regarding the threats she received during the trial was admissible against both defendants, as there was evidence that the defendant was involved in the attempts to influence witnesses. Although the defendant contends that he was not sufficiently linked to this evidence for it to be used against him, the jury reasonably could have concluded otherwise. We have previously outlined the evidence linking the defendant to that evidence. See part II A of this opinion.

During cross-examination of Kerwin, Bush put into evidence a police report of Caban's April 12 meeting with the police. The report contained information that was substantially similar to Caban's testimony, except that it included details concerning a conversation Caban allegedly had with the defendant after the shooting. According to the report, the defendant told Caban that, after the shooting, the victim fell off his bike and crashed. The defendant also told Caban that he then approached the victim and took the victim's gun. Bush offered the police report in an attempt to impeach Caban. The defendant argues that, because the state objected to Bush's offer of the police report, it follows that the state would not have admitted the report into evidence if the defendant had been tried separately. The defendant claims that, because of the joint trial, he was forced to defend himself against both the state and Bush.

---

[18] The defendant also claims that he was unfairly prejudiced by the spill-over effect of the three audiotapes of Bush's telephone conversations from jail. We previously have concluded that those audiotapes were admissible against the defendant as nonhearsay consciousness of guilt evidence. See part II of this opinion. Thus, we address the defendant's severance arguments only with respect to Caban's testimony of intimidation and the police report regarding her previous statements.

Contrary to the defendant's claim, however, the fact that Bush, as opposed to the state, put the report into evidence did not require separate trials. The defendant conceded at oral argument that the state could have offered this police report against the defendant at a separate trial. Whether the state would have offered it is speculative and is not relevant to this analysis. We conclude that the defendant's claim that he was prejudiced by the joint trial because of the admission of the police report is without merit.

We similarly reject the defendant's spillover effect argument. "[I]t is not enough for the defendant to show that a joint trial was less advantageous than a separate trial would have been. Rather, the defendant must prove substantial injustice. *State* v. *White*, supra, 229 Conn. 160–61. We decline to hold that a separate trial is necessary whenever any potentially incriminating evidence against one codefendant is introduced during a joint trial. See *Richardson* v. *Marsh*, [481 U.S. 200, 209–10, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987)]." (Internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 633. The jury was instructed numerous times to consider the case against each defendant independently. "In the absence of a showing to the contrary, the jury is presumed to have followed the instructions of the court." *State* v. *Booth*, supra, 633. We conclude that the trial court properly denied the defendant's motion for severance.

IV

The defendant next claims that the trial court took on the role of an advocate for the state by questioning witnesses throughout the trial, thereby depriving the defendant of his due process rights under the federal and state constitutions. U.S. Const., amends. V, XIV;

Conn. Const., art. I, § 8.[19] Specifically, the defendant argues that the trial court's questioning of two witnesses—Johnson and Pettway—improperly revealed to the jury that the court did not believe their testimony, thereby prejudicing the defense. The defendant also argues that the court's constant questioning of numerous other witnesses introduced irrelevant and prejudicial evidence into the trial. While the defendant did not object to the trial court's questions on these grounds during the trial, he now claims that he is entitled to relief under *State* v. *Golding,* supra, 213 Conn. 239–40. We disagree.

"Before turning to the allegations made by the defendant, we recite certain well established principles regarding the responsibilities of the trial judge in conducting a criminal trial. Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. U.S. Const., amend. XIV; Conn. Const., art. I, § 8 . . . . In a criminal trial, the judge is more than a mere moderator of the proceedings. It is his responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding. . . . *State* v. *Gordon,* 197 Conn. 413, 424D–25, 504 A.2d 1020 (1985); *State* v. *Fernandez,* [198 Conn. 1, 10, 501 A.2d 1195 (1985)]. Consistent with his neutral role, the trial judge is free to question witnesses or otherwise

---

[19] The fifth amendment to the United States constitution provides in relevant part: "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

The constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions, the accused shall have the right to . . . a speedy, public trial by an impartial jury. No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

intervene in a case in an effort to clarify testimony and assist the jury in understanding the evidence so long as he does not appear partisan in doing so. *State* v. *Bember*, [183 Conn. 394, 401–402, 439 A.2d 387 (1981)]. Thus, when it clearly appears to the judge that for one reason or another the case is not being presented intelligibly to the jury, the judge is not required to remain silent. On the contrary, the judge may, by questions to a witness, elicit relevant and important facts. *State* v. *Fernandez*, supra, 11." (Internal quotation marks omitted.) *State* v. *Tatum*, 219 Conn. 721, 740, 595 A.2d 322 (1991).

"One of the chief roles of the trial judge is to see that there is no misunderstanding of a witness's testimony. The judge has a duty to comprehend what a witness says as much as it is his duty to see that the witness communicates with the jury in an intelligible manner. A trial judge can do this in a fair and unbiased way. His attempt to do so should not be a basis of error. Where the testimony is confusing or not altogether clear the alleged jeopardy to one side caused by the clarification of a witness's statement is certainly outweighed by the desirability of factual understanding. The trial judge should strive toward verdicts of fact rather than verdicts of confusion. *Ray* v. *United States*, 367 F.2d 258, 261 (8th Cir. 1966), cert. denied, 386 U.S. 913, 87 S. Ct. 863, 17 L. Ed. 2d 785 (1967), quoted in *United States* v. *McColgin*, 535 F.2d 471, 475 (8th Cir.), cert. denied, 429 U.S. 853, 97 S. Ct. 145, 50 L. Ed. 2d 128 (1976)." (Internal quotation marks omitted.) *State* v. *Bember*, supra, 183 Conn. 402–403.

A

The defendant claims that the trial court inappropriately interjected itself into Johnson's testimony four times. The first instance of alleged impropriety occurred during the state's direct examination of John-

son, when the trial court asked the court reporter to read back part of the testimony and then asked Johnson to affirm that it was correct.[20] The defendant claims that the court's action unduly highlighted the importance of this testimony. We disagree. The trial court asked for Johnson's testimony to be read back to ensure that the jury heard the shooters' statement accurately. The trial court did not comment on the statement's importance in any manner. Although this is a practice that should be employed sparingly and with caution, the court's merely asking for repetition of a statement does not necessarily render the trial court an advocate for the state. Thus, the defendant cannot prevail on this unpreserved claim of error.

The second instance of alleged impropriety occurred during the state's direct examination of Johnson, when the trial court instructed Johnson to address the question that had been presented.[21] The defendant claims

[20] The following colloquy developed at trial:

"[Assistant State's Attorney]: Did you say anything to [the shooters], Mr. Johnson?

"[Johnson]: Yeah.

"Q. What did you say?

"A. Asked them why they do that.

"Q. Did they give you a response?

"A. You kill one of our brothers, we return and kill one of their brothers back.

"The Court: Could you read that back?

"The Court Reporter: I hope so.

"(Whereupon the court reporter read the record.)

"The Court: Is that correct?

"[Johnson]: Yes."

[21] The following colloquy developed at trial:

"[Assistant State's Attorney]: . . . The individual that you described before [the defendant] . . . did you see him with a gun in the hallway of 615 Broad Street shooting in a direction of the individual on the Moped?

"[Johnson]: Like I said, the person had masks on, so I cannot say I seen [the defendant] with a gun.

"The Court: Maybe you don't understand. He is asking a different question. You are required to answer the question, not tell him something other than that.

"[Johnson]: No, I did not."

that the trial court assumed the role of advocate by challenging the appropriateness of Johnson's response to the state's question. We disagree.

Attempts to facilitate a witness' understanding of a question are not improper. See *State* v. *Harris*, 28 Conn. App. 474, 479–81, 612 A.2d 123, cert. denied, 223 Conn. 926, 614 A.2d 828 (1992) (no error where trial court rephrased state's questions after witness failed to answer appropriately). The trial court here was fulfilling its function of ensuring that the witness answered the state's question. Thus, the defendant cannot prevail on this unpreserved claim of error.

The third claim of alleged impropriety involves the trial court's questions to Johnson regarding his inability to read his prior statement to the police.[22] The defendant claims that this questioning was improper because it

---

[22] The following colloquy developed at trial:

"The Court: See if you can read that.

"[Johnson]: I can't read that good.

"The Court: I'm going to give you a pair of glasses.

"[Johnson]: With glasses I cannot read that good.

"The Court: Are you saying, therefore, you were unable to read the instrument after you had completed it?

"[Johnson]: To be honest, yes.

"The Court: If that is what was your claim, pass and bring in the person who put it together.

"[Assistant State's Attorney]: If I may just continue with some other questions then?

"The Court: Sure. We must have a box of glasses up on the 7th floor. No glasses would help you?

"[Johnson]: That's what I am saying to you. Thank you.

"The Court: Do you have a driver's license?

"[Johnson]: No, I don't.

"The Court: Never did?

"[Johnson]: I did.

"The Court: How did you get that?

"[Johnson]: Hmm?

"The Court: How old are you, Mr. Johnson?

"[Johnson]: 37. I can read, but certain things I don't understand the words and stuff.

"The Court: Mm-hmm."

served to impeach Johnson's testimony that his prior statement was a lie and that he could not identify the shooters. We disagree.

The trial court questioned Johnson about his inability to read in order to clarify whether he could not read that day because he needed glasses or whether he could not read at all. The trial court reasonably sought to clarify Johnson's ambiguous answer. It did so without impugning Johnson's credibility.

Moreover, the trial court instructed the jury that it "should not draw any inferences whatsoever from any questions I may have asked any witnesses in the case. If I did, and I did, give no consideration to the answers given to any questions I may have asked. You have to examine the testimony of the witnesses that were presented here before you." The court later stated: "Now, if I've made any reference to the position of the state or the accused—I don't think I have—I have no interest. This is not my case; it's your case. You're the people that have to decide it. . . . It's not any intention on my part to convey to you, directly or indirectly, any feeling I would have on the outcome. I have an interest solely in seeing that it's tried fair and square, that it's tried in an orderly and timely manner. I have no interest in the verdict you are to render. That is your function; it is your responsibility." "We have always given great weight to curative instructions in assessing claimed errors." *State* v. *Fernandez*, supra, 198 Conn. 17; see also *State* v. *Harris*, supra, 28 Conn. App. 480–81 (court's questions clarifying testimony harmless due to curative instruction). In light of the curative instructions given by the trial court, the defendant cannot prevail on this unpreserved claim of error.

The last claim of alleged impropriety with respect to the trial court's questioning of Johnson involves inquiries by the trial court regarding the things that Johnson

could and could not do when he was under the influence of drugs, and how long he usually would remain under the influence. The defendant claims that this testimony was irrelevant and inflammatory, and that the trial court's questions implied an opinion that the court did not believe that Johnson was so high on drugs that he did not know what he was doing when he made his statement to the police. The defendant also argues that, similar to *State* v. *Delarosa*, 16 Conn. App. 18, 28, 547 A.2d 47 (1988), the trial court's questioning on the effects of being high "evinced not merely an educational process for the jury but an overall atmosphere indicative of judicial condemnation of the drug scene in which the defendant was alleged to be involved." Id. (reversing defendant's conviction because court engaged in lengthy dialogue with state's witness regarding origin, properties and uses of cocaine).

Although the trial court's questioning on this matter was extensive, we conclude that it did not constitute a violation of the defendant's constitutional right to due process. In light of the fact that Johnson's statement and his testimony were contradictory, Johnson's condition when he made the police statement was relevant to the jury's determination of which story to believe.[23] The

[23] The defendant himself recognized this fact, as he later questioned Johnson regarding the effect that being "high" had on his judgment. On recross examination, the following colloquy developed:

"[Defense Counsel]: Just a few questions, Mr. Johnson, in response to several of the court's questions. When the Judge inquired of you what it's like to be very high, as you described being on the 19th of September, '94, you indicated you could walk and you could talk, correct?

"[Johnson]: Yes.

"Q. Would you stumble at times if you were high?

"A. I'd be light on my feet, but stumble, no.

"Q. Would you nod out sometimes?

"A. Yes.

"Q. Go to sleep?

"A. Yes. . . .

"Q. You were high enough on the 19th of September of '94 to walk into the police station, turn yourself in on some outstanding robbery warrants with a pocketful of cocaine?

trial court's questions aimed to clarify for the jury what Johnson meant by "high," so that the jury could understand the implication of Johnson's testimony. This was relevant to the jury's determination of credibility. The trial court did not comment on Johnson's credibility nor did it attack or credit his testimony in any manner. Contra *State* v. *Smith*, 200 Conn. 544, 550, 512 A.2d 884 (1986) (trial court's questioning of state's witness about his experiences as Iranian hostage prejudicial to defendant because it bolstered witness' credibility and was not relevant to case).

*State* v. *Delarosa*, supra, 16 Conn. App. 18, is distinguishable from this case. In *Delarosa*, the defendant was charged with possession of cocaine with intent to sell, and the trial court's apparent condemnation of drug use therefore reflected on the defendant himself. In contrast, the defendant here was not alleged to have been involved in drug activities, and the trial court's comments regarding drug use were directed at a state's witness, not the defendant.[24]

---

"A. That is the only way I got there.

"Q. If you weren't very high at the time, you wouldn't have walked in the police station with cocaine?

"A. Yes.

"Q. You wound up serving four years?

"A. Yes, I did.

"Q. Was that a wise decision?

"A. No, it wasn't.

"Q. Would the fact that you were very high have effected your judgment in that respect?

"A. Yes.

"Q. Ultimately cost you four years in the can?

"A. Yes, it did.

"Q. You could walk and you could talk?

"A. Yes.

"Q. And you knew what color you were?

"A. Yes."

[24] Moreover, the defendant in *Delarosa* objected at the time of the trial court's questions, arguing that the colloquy was irrelevant and inflammatory, whereas the defendant here did not object on these grounds, but rather, is seeking review under *Golding*.

We conclude, after a careful review of the record, that the trial court's questioning of Johnson regarding the fact that he was on drugs when he gave his statement to the police was relevant to the jury's determination of credibility and was not prejudicial to the defendant's case. Moreover, in view of the trial court's curative instructions, set forth previously, we find that the defendant's constitutional right to due process was not violated by this questioning.

## B

The defendant also claims that the trial court's questioning of Pettway violated his constitutional rights to due process. The following additional facts are relevant to the resolution of this claim. Bush called Pettway as his sole defense witness. Pettway testified that, on the night of the murder, he and the victim were at a party. Pettway and the victim then left the party on the victim's dirt bike, with Pettway driving. They went to the Pequonnock apartments, where Pettway lived at the time, to get the victim's goggles, which Pettway had borrowed. When they arrived at the apartment building, Pettway left the bike running, dismounted it and went inside. Pettway testified that he went to his apartment, retrieved the goggles and entered the elevator to go back downstairs. Pettway testified that, while he was in the elevator, he heard shots. He then exited the elevator on the second floor and ran up the stairs to his apartment. Pettway testified that, in the apartment, his aunt then told him, "Your friend fell off the bike." Pettway looked out the window and saw the bike and the victim lying on the ground. He ran outside to see if the victim was all right, and stayed with him until the police and ambulance arrived. Pettway testified that he was "hysterical" and "lost" and "shocked" during this time period.[25] He further stated that he did not tell the police

---

[25] When Pettway first stated that he was "hysterical," the court queried, "Hysterical; is that right?" Pettway then answered, "Yeah."

who the victim was because they did not ask him. When the victim was taken to the hospital, Pettway went back to his apartment. On cross-examination by the state, Pettway denied that he had dropped the victim off with any knowledge of what was going to happen to him there. When all the parties had finished examining Pettway, the trial court questioned him as to the location where Pettway had found the victim lying on the ground.[26]

[26] The following colloquy developed at trial:

"The Court: How come you drove?

"[Pettway]: Because I wanted to ride the dirt bike. I wanted to drive.

"The Court: And did he know where you lived?

"[Pettway]: No.

"The Court: Did he know he was going to the Pequonnock Apartments?

"[Pettway]: He knew where I lived, but he didn't know where I lived at.

"The Court: What's that mean?

"[Pettway]: In other words, he knew I lived at Pequonnock Apartments. He didn't know what floor and none of that.

"The Court: I see. This party on Stratford Avenue—

"[Pettway]: Yes.

"The Court:—is it a club?

"[Pettway]: Yes.

"The Court: Is it in the back room behind 5th and Stratford, go in from the side street?

"[Pettway]: No.

"The Court: Where is it?

"[Pettway]: I think it's on the corner of Hollister.

"The Court: Hollister?

"[Pettway]: Yes.

"The Court: In the store fronts?

"[Pettway]: Small club.

"The Court: It was after 1 o'clock, wasn't it?

"[Pettway]: I have no idea.

"The Court: Would it make any difference?

"[Pettway]: It probably would. I don't know. I don't know what time it was.

"The Court: Listen, I want this jury to be clear on this photographic situation. Your aunt told you, you got—your original statement was that this motorcycle came down and you got off and you left him there, you went upstairs and you were coming back down and you heard some shots, and you ran back upstairs and your aunt said 'Your friend fell off the bike'; right?

"[Pettway]: Yes.

"The Court: You don't want the jury to think he fell off the bike here in front of this door?

On appeal, the defendant claims that the trial court's questioning implied that it agreed with the state's theory that Pettway had dropped the victim off with knowledge that he would be murdered. We disagree. The trial

"[Pettway]: No.

"The Court: Do you know where she saw him fall?

"[Pettway]: Where he was laid out at.

"The Court: And that is where you found him when you came downstairs?

"[Pettway]: Yes.

"The Court: Is that the scene that you found him at?

"[Pettway]: Yes.

"The Court: And he—he was on the ground?

"[Pettway]: On the other side of the bike.

"The Court: Adjacent to the bike?

"[Pettway]: Yes.

"The Court: And the police were there at that point?

"[Pettway]: They came. They wasn't right there, but they came.

"The Court: I didn't ask you that. Were they there when you got over to him?

"[Pettway]: No.

"The Court: You didn't go over to him on the ground to see if he was alive or dead?

"[Pettway]: I called his name.

"The Court: Called his name. Did he respond?

"[Pettway]: No.

"The Court: Did you ask him who did it?

"[Pettway]: No.

"The Court: You didn't want to know?

"[Pettway]: Did what—

"The Court: What do you think happened?

"[Pettway]: By my knowledge, he could have fallen off the bike or crashed.

"The Court: You didn't know he was shot?

"[Pettway]: You couldn't see no bullets.

"The Court: You heard the bullets?

"[Pettway]: Yes.

"The Court: Your aunt said what?

"[Pettway]: Your friend fell off the bike.

"The Court: She didn't know what went on on the patio?

"[Pettway]: No.

"The Court: I see. Nope, you see this picture? I'm talking about state's exhibit 5. It shows the entryway.

"[Pettway]: Yes.

"The Court: Is that correct? And you see the little stanchions mentioned?

"[Pettway]: Yes.

"The Court: And do you know when they put those up? What's that all about?

"[Pettway]: Basically, shell cases or whatever.

court's questions focused on the position of the dirt bike prior to and after the shooting. The trial court also asked about Pettway's actions when he approached the

"The Court: Yeah, so that's something you knew; right?

"[Pettway]: Yeah.

"The Court: You [k]now this picture, it's state's exhibit 3, see the view is away from the entry, isn't it?

"[Pettway]: Yes.

"The Court: And, therefore, all the markings for the shell casings have been turned around; is that true?

"[Pettway]: That's what they look like.

"The Court: Well, have they or have they not?

"[Pettway]: That's what they look like to me.

"The Court: Either that or the markings have numbers on each side; correct?

"[Pettway]: Yes, sir.

"The Court: You don't know, do you?

"[Pettway]: No.

"The Court: When you are looking out here and see the police car—

"[Pettway]: Yes, that's a police car.

"The Court: Now, the police car is at the top of the stairs—one, two, three, possibly four steps; is that correct?

"[Pettway]: Yes.

"The Court: Huh?

"[Pettway]: Yes.

"The Court: So the jury will understand, that bike that you were driving didn't go down those stairs to get there?

"[Pettway]: No.

"The Court: On each side of this entryway, as I recall it, is all a brick patio before the front door; correct?

"[Pettway]: Yes.

"The Court: And there is a—not a handicap ramp, but a ramp so you don't have to go up and down stairs?

"[Pettway]: Yes.

"The Court: And that's been there for—

"[Pettway]: Awhile.

"The Court: Mm-hmm. So you can drive your bike in there. You did. You stopped. You got off and you went in. And, as far as you know, the next time you saw the bike, it was over here where your aunt said, 'Your friend fell off his bike?'

"[Pettway]: Yes.

"The Court: And you know this site. You know where it is opposite Allen Street?

"[Pettway]: Yes.

"The Court: Down on Broad?

"[Pettway]: Yes.

victim in order to clarify his testimony that, at that point in time, Pettway did not know that the victim had been shot. We fail to see anything in the court's questioning that implies partiality toward the state's theory that Pettway was involved in the crime.

The defendant also argues that the trial court's question, "Hysterical; is that right?" indicated that it did not believe Pettway's testimony. See footnote 25 of this opinion. We disagree. The trial court's question merely served to clarify what word the witness had used in describing his state of mind. Pettway then affirmed that the court had heard him correctly. The defendant has given us no reason to believe that the trial court's statement did anything other than clarify the witness' testimony for the jury. We conclude that the trial court's questioning of Pettway did not violate the defendant's constitutional rights.

C

The defendant also claims that the trial court committed misconduct when it questioned a variety of other witnesses during the trial. The defendant argues that the trial court's questions brought forth irrelevant and prejudicial information to which the jury otherwise

"The Court: On the opposite side of the street?
"[Pettway]: I know where it was at.
"The Court: How far would you say that is from the entrance here?
"[Pettway]: It's a walk. It ain't too far. It is like across the street diagonally.
"The Court: How far?
"[Pettway]: I can't—I don't know how far it was.
"The Court: You don't know if it is 50 yards or 100 yards?
"[Pettway]: No.
"The Court: How far did you go in school?
"[Pettway]: Tenth grade.
"The Court: Tenth.
"[Pettway]: Yes.
"The Court: Had you been working at this time?
"[Pettway]: No.
"The Court: No. Okay."

would not have been exposed and likely indicated to the jurors that the defendant was not being an effective advocate for himself.[27] Upon a review of the record, we find that, in each of the alleged instances of impropriety, the trial court merely clarified the testimony for the jury and did not assume the role of advocate for a certain position. See *State* v. *Mack*, 197 Conn. 629, 641,

[27] In support of this claim, the defendant cites the following situations: After the parties had examined state's witness Officer Donna Boyd of the Bridgeport police department, the trial court clarified her testimony regarding the number of shell casings she had discovered upon arriving at the scene of the crime.

The trial court briefly questioned state's witness Officer Willie Samuel of the Bridgeport police department as to his understanding of a question posed by the state.

After the state's direct examination of James Stephenson, a criminalist firearms and tool mark examiner, but prior to any cross-examination, the trial court questioned the witness regarding whether all ten shell casings found at the scene came from the same weapon. During the defendant's cross-examination of Stephenson, the trial court clarified whether one of the ten bullets fired was a copper jacketed bullet.

During the defendant's cross-examination of Johnson, he stated that he never had been convicted of escape in the first degree. The trial court then questioned Johnson in order to clarify that he had been charged with a crime after failing to report back to a halfway house after a furlough.

During Bush's cross-examination of Johnson, the trial court asked numerous questions regarding the floor plan of the lobby, the milk crate that Johnson used to sit on, whether there were bullet holes in the glass of the lobby and where the gun was when the shooting occurred.

During the testimony of Detective James Kirkland of the Bridgeport police department, the trial court asked questions to distinguish between Kirkland's first and second meetings with Caban, such as the dates of each meeting and who was present at each meeting. The trial court also questioned Kirkland about his knowledge of this homicide when he spoke with Caban about a different matter.

After the defendant's recross-examination of Inspector George Nobile of the gang prosecution bureau, the trial court clarified his testimony regarding who was present at the April 12, 1996 meeting with Caban.

At the close of Caban's testimony, the trial court questioned her regarding the floor plan of the apartment building and other details of her testimony.

At the close of the testimony of Assistant State's Attorney John Blawie, the trial court clarified some facts regarding a case Blawie had initiated against Johnson that the state later nolled when the victim, Caban, did not appear in court.

500 A.2d 1303 (1985) (no abuse of discretion where court's questions "can reasonably be viewed as intended to clear up a possible misunderstanding by the jury"). As we stated in State v. Gordon, supra, 197 Conn. 425–26, "[t]he judge took no position of advocacy regarding the outcome of the case, and made no improper comments on the significance of the evidence presented. At no time did the judge convey to the jury his opinion as to the guilt or innocence of the defendant." Moreover, we disagree with the defendant's claim that the trial court's questions implied to the jury that defense counsel failed to ask questions properly. Contra State v. Echols, 170 Conn. 11, 13–16, 364 A.2d 225 (1975) (new trial ordered when court told counsel to " '[a]sk [a witness] why' "). The defendant therefore cannot prevail on these unpreserved claims of error.

Although the trial court's questioning did not violate the defendant's constitutional rights, we caution that trial courts should be careful to avoid giving the impression of passing upon the credibility of witnesses.

V

The defendant next claims that the trial court improperly denied the defendant's motion for acquittal based on insufficient evidence to support a conviction for accessory to murder and conspiracy to commit murder. The defendant argues that the evidence, viewed in the light most favorable to the state, demonstrates that the defendant did not shoot at the victim, but rather that he shot upward into the air. This evidence, the defendant argues, does not support a finding of an intent to commit murder. As a result, the defendant argues that the state failed to sustain its burden of proving this element beyond a reasonable doubt and, thus, that the defendant's convictions for both murder as an accessory and conspiracy to commit murder must be vacated. We disagree.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Delgado*, 247 Conn. 616, 620–21, 725 A.2d 306 (1999).

"In order to be convicted under our murder statute, the defendant must possess the specific intent to cause the death of the victim. . . . To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. . . . To be guilty as an accessory one must share the criminal intent and community of unlawful purpose with the perpetrator of the crime and one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it. . . . Thus, intent is a necessary element to the crime of murder whether the defendant is

the principal or merely an accessory." (Citations omitted; internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 655–56.

"Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one." (Citation omitted; internal quotation marks omitted.) Id., 656.

We have held that "[t]o establish the crime of conspiracy under § 53a-48 . . . it must be shown that an agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . Further, the prosecution must show both that the conspirators intended to agree and that they intended to commit the elements of the underlying offense." (Internal quotation marks omitted.) *State* v. *Henry*, supra, 253 Conn. 367.

The jury reasonably could have found that the defendant had the intent to cause the victim's death. There was evidence that the defendant had an agreement with Bush, a fellow gang member, to avenge the death of one of their "brothers" by murdering the victim. The defendant was in the lobby of the apartment building speaking with Johnson prior to the murder. When Pettway entered the lobby, the defendant asked him who was outside sitting on the dirt bike. After the defendant confirmed that the victim was outside, the defendant

went upstairs and summoned Bush. Shortly thereafter, both the defendant and Bush, armed with handguns, returned to the lobby from the stairwell above, and peeked around the corner in the direction of the victim. Bush asked the defendant if he was ready, the defendant answered yes, and Bush started firing.

An intent to kill may be inferred from the use of handguns. Id., 367. Although the defendant diverted his aim from the victim and fired only once into the air, Bush fired several rounds at the victim. The defendant and Bush then escaped through the lobby, where Johnson asked them why they had shot the victim. Either Bush or the defendant responded that they had done so in retaliation for the recent murder of one of their "brothers." This evidence supports a finding that the defendant aided Bush with the intent to kill the victim.

The defendant argues that, because the evidence demonstrates that he did not shoot directly at the victim, but rather shot upward into the air, the state failed to sustain its burden of proving intent beyond a reasonable doubt. We disagree. The accessory to murder and conspiracy to commit murder charges do not require a finding that the defendant aimed a gun toward the victim with the intent to shoot the victim himself. As long as the evidence demonstrates the defendant's intent to kill the victim, and his knowing assistance in the murder, there is sufficient evidence to support the jury's conclusion that the defendant had conspired to murder the victim and acted as an accessory. We conclude that the evidence supported the jury's finding that the defendant was guilty of murder as an accessory and conspiracy to commit murder beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other justices concurred.