******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DION BUSH *v.* COMMISSIONER OF CORRECTION
(AC 37238)

Sheldon, Keller and Foti, Js.

*Argued September 12—officially released December 6, 2016*

(Appeal from Superior Court, judicial district of
Tolland, Mullins, J.)

*David J. Reich*, for the appellant (petitioner).

*Linda Currie-Zeffiro*, assistant state's attorney, with
whom, on the brief, were *John C. Smriga*, state's attor-
ney, and *Craig Nowak*, senior assistant state's attorney,
for the appellee (respondent).

*Opinion*

KELLER, J. The petitioner, Dion Bush, appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus as well as the denial of his petition for certification to appeal.[1] The petitioner claims that the habeas court erred by not concluding that his appellate counsel in a prior habeas appeal was ineffective. Specifically, the petitioner argues that his prior habeas appellate counsel was ineffective by failing to properly brief issues on appeal relating to: (1) alleged ineffectiveness by the petitioner's criminal trial counsel for not moving to sever the petitioner's trial from that of his codefendant; and (2) an alleged conflict of interest by criminal trial counsel resulting from his representation of another client that rendered his representation of the petitioner ineffective. We conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal, and, accordingly, we dismiss the appeal.

The following facts underlying the petitioner's conviction, as set forth by our Supreme Court in the petitioner's direct appeal, are pertinent to our resolution of these issues. "On September 25, 1993, the victim, Norman Jones, a member of the Brotherhood street gang, was socializing at a party in Bridgeport. Antoin Pettway also was present at the party. At some point during the evening, the victim and Pettway left the party together and went to the Pequonnock housing project, where Pettway had an apartment. Upon arriving at the housing project, Pettway entered his apartment building. The victim, who did not live at Pequonnock, remained directly outside the building's front entrance.

"Pettway encountered Robert Robertson, a member of the Bush Mob gang, in the building's lobby. Robertson asked Pettway if the person outside the building's entrance was Jones, and Pettway responded affirmatively. Both men then left the lobby. Robertson entered the stairwell and went upstairs, while Pettway took the elevator to his apartment.

"Shortly thereafter, Robertson and the [petitioner], who also was a member of the Bush Mob gang, entered the lobby from the stairwell. The two men, each of whom was armed with a handgun, then went to the building's front entrance and pointed their guns in the direction of the victim. Robertson diverted his aim from the victim and fired once into the air. The [petitioner], however, fired several rounds at the victim, stopping only when his gun had been emptied. As the [petitioner] and Robertson then retreated through the lobby, Bernard Johnson, who had been in the lobby at that time, asked them why they had shot at the victim. One of the two men responded that they had done so to retaliate for the recent murder of a Bush Mob gang member.

"Within minutes, Bridgeport police officers arrived

and found the victim lying on the ground a short distance away from the entrance of the building. He had been shot once in the back and was unconscious. He subsequently was transported to Saint Vincent's Medical Center in Bridgeport, where attempts to save his life proved unsuccessful." (Footnote omitted.) *State* v. *Bush*, 249 Conn. 423, 425–26, 735 A.2d 778 (1999).

The petitioner and Robertson were both charged with murder as either a principal or an accessory in violation of General Statutes §§ 53a-54a (a) and 53a-8, and conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a (a). The petitioner was represented by Attorney Dante Gallucci, and Robertson was represented by Attorney Lawrence Hopkins. "Prior to trial, the state moved to consolidate the trials of the [petitioner] and Robertson. Neither the [petitioner] nor Robertson objected to that motion, and thereafter, the trial court granted it.[2] Immediately before the start of the state's case-in-chief, however, Robertson moved to sever the trials on the ground that there was a *potential* for antagonism between his defense and the [petitioner's].[3] Although both the [petitioner] and Robertson planned to assert that they had not been present when the victim was shot, Robertson claimed that he *might* pursue a different strategy during the trial if, as anticipated, the state presented evidence from which the jury could infer that the [petitioner] had fired the shot that had killed the victim. Thereafter, the [petitioner] also moved for severance claiming that, if Robertson were to change his theory of defense during trial, there was a *potential* for antagonism between his defense and Robertson's. The trial court determined that, because at that time there was no conflict between the defenses of the [petitioner] and Robertson, the motions for severance on the basis of antagonistic defenses were premature. The court, therefore, denied those motions. In so doing, however, the court specifically stated that both the [petitioner] and Robertson could renew their severance motions if an actual conflict between their defenses arose during trial. Neither the [petitioner] nor Robertson renewed his motion for severance on the basis of *antagonistic defenses* at any time thereafter." (Emphasis in original; footnotes altered.) Id., 426–27.[4]

During the trial the state called as a witness Maria Caban, who testified that the petitioner told her that he had shot the victim and that Robertson was also present during the shooting. She also testified that the petitioner told her that Robertson did not fire at the victim. Instead, he indicated that Robertson "punked out" and fired a single shot into the air. She also stated that, subsequent to the shooting, a group of men came to her apartment to retrieve what she was told was the murder weapon, and that the petitioner, but not Robertson, was present at that time.[5] During cross-examination of Caban, Hopkins prompted her to reiterate those portions of her testimony that indicated that

Robertson did not fire the shot that killed the victim. During his closing argument on behalf of Robertson, Hopkins argued that both Johnson and Caban lacked credibility, but that even if the jury believed their suspect testimony, it was clear that the bullet that killed the victim had been fired by the petitioner. The jury convicted the petitioner of murder and conspiracy to commit murder,[6] and the court, *Ford, J.*, imposed a total effective sentence of sixty years incarceration.

The petitioner, still represented by Gallucci, appealed his conviction to our Supreme Court, arguing, inter alia, that the trial court erred by denying his motion to sever his trial from that of Robertson. Our Supreme Court affirmed the conviction, concluding that the petitioner had failed to preserve the claim by failing to renew his severance motion on the basis of antagonistic defenses at any time during the trial as permitted by the court. *State* v. *Bush*, supra, 249 Conn. 428.

The petitioner then filed his first petition for a writ of habeas corpus.[7] Represented by Attorney Howard Wicker, the petitioner claimed that he was deprived of the effective assistance of counsel at his criminal trial because Gallucci did not, inter alia: (1) timely move to sever his trial from that of Robertson; or (2) move to withdraw from representing the petitioner because of a conflict of interest. During the petitioner's first habeas trial, Gallucci testified as a witness for the respondent, the Commissioner of Correction, and stated that the petitioner's defense was one of general denial, although the petitioner did not have a supportable alibi. With regard to Robertson's defense, Gallucci explained: "Well, the basic thrust of the defense, that he wasn't involved. I recall at some points, [Hopkins] was also trying to show . . . not only was [Robertson] not there and [he] didn't do it, but virtually nobody said [he] did it. It was a little different than our defense, but basically, the defenses were consistent; that [they] weren't there. [They] didn't do it." The habeas court, *White, J.* (first habeas court), denied the petition, concluding that the petitioner had failed to show that Gallucci was deficient in his performance at trial or that the petitioner was prejudiced by such alleged deficiencies. See *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The first habeas court also denied the petition for certification to appeal. Represented by Special Public Defender Mary Trainer, the petitioner appealed the first habeas court's judgment to this court. See *Bush* v. *Commissioner of Correction*, 92 Conn. App. 537, 885 A.2d 1265 (2005), cert. denied, 277 Conn. 906, 894 A.2d 986 (2006). This court concluded that the first habeas court did not abuse its discretion in denying the petition for certification to appeal.

The petitioner then filed his second petition for a writ of habeas corpus, the action underlying this appeal. The petitioner, represented by Attorney Frank Canna-

telli, alleged ineffective assistance by Trainer, Wicker, and Gallucci.[8] After a trial, the habeas court, *Mullins, J.* (second habeas court), for reasons detailed subsequently in this opinion, denied the petition for a writ of habeas corpus as well as a subsequent petition for certification to appeal. The petitioner then brought the present appeal. The issues raised in the present appeal relate only to claims in the petition regarding the alleged ineffective assistance of Trainer as appellate counsel in the prior habeas appeal. Additional facts will be set forth as necessary.

As a preliminary matter, we set forth the applicable standard of review. "Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for [a writ of] habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on its merits. . . .

"To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Furthermore, [i]n a habeas corpus proceeding, the petitioner's burden of proving that a fundamental unfairness had been done is not met by speculation . . . *but by demonstrable realities.*" (Citations omitted; emphasis in original; internal quotation marks omitted.) *Griffin* v. *Commissioner of Correction*, 119 Conn. App. 239, 241–42, 987 A.2d 1037, cert. denied, 295 Conn. 912, 989 A.2d 1074 (2010).

"It is axiomatic that, in order to establish a claim of ineffective assistance of *appellate* counsel, a habeas petitioner must establish both deficient performance and the resulting prejudice. . . . The performance prong requires proof that appellate counsel's performance fell below an objective standard of reasonableness. . . . There is a strong presumption that counsel has rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . . Just as the decision of trial counsel not to object to certain evidence is a matter of trial tactics, not evidence of incompetency . . . the

tactical decision of appellate counsel not to raise a particular claim is ordinarily a matter of appellate tactics, and not evidence of incompetency, in light of the presumption of reasonable professional judgment. . . .

"The prejudice prong requires proof that, had the prior performance been reasonable rather than inadequate, there is a reasonable probability that the petitioner would have prevailed on the appeal. . . . A failure to establish either prong will be fatal to a claim of ineffectiveness of counsel. . . . Our scope of review regarding the underlying facts found by the habeas court is the clearly erroneous standard, and the plenary standard of review applies regarding the legal conclusion of whether those facts amount to ineffectiveness of counsel." (Citations omitted; emphasis added.) *Alterisi* v. *Commissioner of Correction*, 145 Conn. App. 218, 222–23, 77 A.3d 748, cert. denied, 310 Conn. 933, 78 A.3d 859 (2013).

We also stress that "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction . . . and it is all too easy for a court . . . to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct . . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 577, 941 A.2d 248 (2008).

I

The petitioner first argues that the second habeas court erred by not concluding that Trainer's performance was deficient for failing to properly brief the issue of Gallucci's alleged ineffectiveness for not moving a second time to sever the petitioner's criminal trial from Robertson's. We do not find this argument persuasive.

The following additional facts are relevant to this claim. In the present appeal, the petitioner points to two instances in his criminal trial that are offered to show that he and Robertson pursued antagonistic defenses necessitating severance. The first instance is the cross-examination of Caban by Robertson's defense counsel, Hopkins, which transpired as follows:

"[Attorney Hopkins]: Miss Caban, you indicated that at some point shortly after the shooting you had an opportunity to speak to Mr. Bush, correct?

"[The Witness]: Yes.

"[Attorney Hopkins]: Dion Bush. And he told you at

that time that [Robertson], although he may have been present, fired one shot and he, as you say, punked out. Did he tell you that he fired that shot into the air? . . .

"[The Witness]: He—he—excuse me. He said he wasn't trying to shoot him.

"[Attorney Hopkins]: Right. He shot—he wasn't trying to shoot him and that he himself, Mr. Bush, in fact, emptied his . . . weapon into the victim, Norman Jones, correct? He admitted to you that he killed him?

"[The Witness]: Yeah.

"[Attorney Hopkins]: All right. Now, I think you indicated that somebody at some point in time came to your apartment to retrieve what you were told was the murder weapon; is that right?

"[The Witness]: Yeah. . . .

"[Attorney Hopkins]: Let me ask you this: Mr. Robertson was not there at that time; isn't that a fact?

"[The Witness]: No, I don't think he was.

"[Attorney Hopkins]: Okay. And, in fact, you had named four individuals who were present when you claimed that that weapon was removed; is that right? Do you recall that—that Dion Bush was present? Do you recall telling that to the police in 1996 when you gave that written statement?

"[The Witness]: I recall." The witness continued to identify those present when the gun was removed, none of whom was Robertson.

The petitioner also points to Hopkins' closing argument, in which he argued, in part: "Any inference that one might draw, that I don't think came out from the testimony, regarding those facts, which bullet killed [the victim], the [prosecution] asks you to disregard that. It doesn't make any difference. All the testimony that they put on, it is clear, even if you were to believe it, that clearly the bullet that killed [the victim] had to come from Dion Bush, both Maria Caban and [Johnson], from what he says about the circumstances, assuming he was there, and assuming you could believe him, both say through some means the only thing they either heard or observed, in the case of Mr. Johnson, is Mr. Robertson firing one shot into the air, not attempting to hit the person who was the target . . . . Which bullet killed [the victim], as if it has no relevance whatsoever, it has a lot of relevance." According to the petitioner, this closing argument amounted to "[e]ssentially . . . prosecuting the petitioner."

In regard to the severance issue, the second habeas court concluded: "The credible evidence presented in the prior habeas [trial] established that both the petitioner and Robertson pursued defenses of denial that they committed the offenses and, therefore, were not presenting antagonistic defenses. There was no evi-

dence that the petitioner could have strengthened his own case or arguments in support of severance. [The first habeas court] relied on the Supreme Court's decision in *State* v. *Robertson*, [254 Conn. 739, 760 A.2d 82 (2000)] . . . which addressed a preserved claim about severance, contrary to the petitioner's unpreserved claim on direct appeal, to conclude that the petitioner's and Robertson's defenses were not antagonistic.[9] That is, there was no basis that necessitated severance of the codefendants' trials. [The first habeas court] also concluded that Attorney Gallucci, who testified about his tactical reasons for not seeking severance after the trial court had denied Robertson's motion for severance, utilized sound tactical judgment by not again requesting severance. . . . [T]he petitioner has failed to show both deficient performance and the necessary prejudice." (Footnotes altered.)

The petitioner's claim is not that Trainer failed to raise the severance issue on appeal, but rather that her appellate brief did not persuasively or sufficiently articulate the severance claim. More precisely, the petitioner claims that the second habeas court erred in concluding that Trainer was not ineffective because she "failed to specifically document that (1) [Gallucci] had no tactical reason for failing to preserve the severance issue; (2) [the first habeas court's] finding that [our Supreme Court's] opinion in *State* v. *Robertson*, supra, [254 Conn. 739] is dispositive of the petitioner's severance issue is in error; [and] (3) [the first habeas court's] determination that the codefendants did not have antagonistic defenses is not supported by the record."[10]

We conclude that Trainer adequately raised these issues in her appellate brief. On appeal from the denial of the petition for certification to appeal the denial of the first habeas petition, Trainer argued that the first habeas court's finding that Gallucci chose not move for severance on the basis of trial tactics was error.[11] Trainer also objected to the first habeas court's reliance on *State* v. *Robertson*, supra, 254 Conn. 739,[12] and noted the allegedly antagonistic defenses of the petitioner and Robertson.[13]

Moreover, the petitioner has not persuaded us that the manner in which Trainer briefed the severance claim prejudiced him because he has not shown that Gallucci's performance was deficient or that his decision not to move for severance prejudiced the petitioner. In his testimony before the habeas courts, Gallucci advanced several tactical reasons why he chose not to move for severance, namely, that: (1) in his experience, joint criminal trials have the benefit of tending to sow reasonable doubt among jurors as to all defendants where the evidence suggests that only one defendant—but it is unclear which one—committed the act; (2) he did not want to draw the ire of the judge and jury by moving to sever on the heels of one such

motion by Robertson; and (3) he believed that severance would better enable the prosecution to strike a deal with Robertson in which he would testify against the petitioner in exchange for a lesser sentence.

"[I]t is all too easy for a court . . . to conclude that a particular act or omission of counsel was unreasonable . . . [and that] [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . ." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, supra, 285 Conn. 577. As did the first habeas court, the second habeas court found that Gallucci had strong strategic reasons not to move for severance, and concluded that both the petitioner and Robertson pursued nonantagonistic defenses of denial during the criminal trial. Under a plenary standard of review, we conclude that the petitioner has not demonstrated error in the second habeas court's determination that Gallucci's strategic reasons for not moving to sever the trials were sound.

We also agree with the second habeas court's determination that the petitioner and Robertson did not pursue antagonistic defenses. Antagonistic defenses necessitating severance occur "[w]hen . . . the jury can reasonably accept the core of the defense offered by either defendant only if it rejects the core of the defense offered by his codefendant . . . . To compel severance the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. . . . Such compelling prejudice does not arise where the conflict concerns only minor or peripheral matters which are not at the core of the defense." (Citation omitted; internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 621, 737 A.2d 404 (1999), cert. denied, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). "[W]e will reverse a trial court's ruling on joinder only where the trial court commits an abuse of discretion that results in manifest prejudice to one or more of the defendants." (Internal quotation marks omitted.) Id., 620. The second habeas court looked favorably upon the findings of the first habeas court and adopted its reasoning. The first habeas court concluded that the petitioner's and Robertson's defenses were not antagonistic because they were not defenses of such a nature that in order for the jury to accept the defense of one defendant, it would have had to reject the defense of the other. It noted that the credible evidence established that both the petitioner and Robertson pursued defenses of denial and that both sought to attack the credibility of the state's witnesses, but did not succeed. It further concluded that there was no basis for severance, and that even if Gallucci had renewed a motion for severance, it would have been denied. We observe that, before the jury could have begun to consider and determine which of the two defendants may have fired the fatal shot, it first would have had to reject their

mutual, nonantagonistic defenses that they were not present.

Nor can we conclude that, had the petitioner succeeded in severing the trials, there was "a reasonable probability that the outcome of the proceedings would have been different . . . ." *Johnson* v. *Commissioner of Correction*, supra, 285 Conn. 575. The petitioner has not identified any key piece of evidence that would have been excluded from his trial had the two trials been severed.[14] In particular, the state still would have been able to present the testimony of Caban and Johnson, and Johnson's statement to the police, all of which implicated the petitioner as the person who shot the victim, as well as portions of "three tape-recorded telephone conversations between the [petitioner] and unidentified third parties . . . indicat[ing] that [he] had been involved in plans to threaten Johnson and Caban in an attempt to influence their testimony." *State* v. *Bush*, supra, 249 Conn. 429.

As the second habeas court noted, "the Appellate Court's [prior] review . . . to determine whether the prior habeas court abused its discretion entailed review of this claim, the facts presented in support thereof, as well as the [first] habeas court's legal conclusions."[15] The second habeas court further found, and we agree, that "[Trainer's] testimony [in the second habeas trial] did not provide any evidence helpful to the petitioner." We therefore agree with the second habeas court that the petitioner has neither shown that Trainer was deficient for failing to properly brief these issues, nor that the petitioner was prejudiced by Trainer's allegedly deficient performance with regard to the severance issue.

Accordingly, as to the severance issue, the petitioner has not "demonstrate[d] that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." (Internal quotation marks omitted.) *Griffin* v. *Commissioner of Correction*, supra, 119 Conn. App. 242. Thus, as to this issue, we reject the petitioner's claim that the second habeas court abused its discretion in denying the petition for certification to appeal.

## II

The petitioner also claims that Trainer did not provide effective assistance of counsel because she failed to adequately brief the issue of an alleged conflict of interest by Gallucci resulting from his representation of another client that rendered his representation of the petitioner ineffective. We do not agree.

The following additional facts, as set forth by the second habeas court, are relevant to this claim. "This alleged conflict of interest, according to the petitioner, arose from [Gallucci] representing the petitioner and

also representing another defendant, one Jamar McKnight . . . . The petitioner's posttrial brief argues that he wants to 'alert the court of a more larger conflict issue. During the testimony, the petitioner testified that he was upset that [Gallucci] represented him at the same time [Gallucci] represented . . . McKnight. McKnight was a case that was up on appeal at the time [Gallucci] represented [the petitioner]. The only relevance to this case is that the gun used by McKnight [in the crime that he had been convicted of] was also the same gun used here to kill the victim of this shooting. From a review of the whole record, it is clear that although the prosecutor [who prosecuted the petitioner also] prosecuted [McKnight], and although . . . [Gallucci] also represented [the petitioner], neither counsel brought this fact to the attention of [the criminal trial court]. The petitioner believes that this was a reason that [Gallucci] never pursued a third-party culpability defense, namely, that [the petitioner] did not do this crime, but McKnight did. This is relevant because the [first habeas court] put that responsibility of bringing the conflict issue up to the trial court on the [petitioner], who was a juvenile when arrested, and in his early twenties when he went to trial. Neither attorney who tried this case brought this fact to the attention of the court, or [the criminal trial judge], so [the petitioner] could be asked whether he would waive any potential or actual conflict.' "

In addressing this claim, we apply the following standard of review pertaining to ineffective assistance of counsel claims based on an actual conflict of interest: "The sixth amendment to the United States constitution as applied to the states through the fourteenth amendment, and article first, § 8, of the Connecticut constitution, guarantee to a criminal defendant the right to effective assistance of counsel. . . . As an adjunct to this right, a criminal defendant is entitled to be represented by an attorney free from conflicts of interest. . . . Thus, [t]he underlying right to conflict free representation is effective assistance of counsel. . . .

"In a case of a claimed conflict of interest . . . in order to establish a violation of [his constitutional rights] the [petitioner] has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance. . . . Unlike other claims of ineffective assistance of counsel, where a petitioner claims that his counsel's performance was deficient because of an actual conflict of interest, prejudice does not need to be established. . . . Instead, [w]here there is an actual conflict of interest, prejudice is presumed because counsel [has] breach[ed] the duty of loyalty, perhaps the most basic of counsel's duties." (Citations omitted; internal quotation marks omitted.) *Hedge* v. *Commissioner of Correction*, 152 Conn. App. 44, 50–51, 97 A.3d 45 (2014), cert. denied,

321 Conn. 921, 138 A.3d 282 (2016).

The second habeas court observed that "[t]he evidence presented . . . encompasses [Wicker's] testimony about his investigation of [the first] habeas claims and which claims to pursue when he amended the petition. Senior Assistant State's Attorney [Cornelius] Kelly testified that he prosecuted McKnight and the petitioner, and was unaware of any connection between the cases. Both Wicker and Kelly recalled testimony by a firearms expert that the shells from the McKnight shooting were of a similar type compared to those from the Bush/Robertson shooting. [Gallucci] testified that he represented McKnight at trial and on appeal. Gallucci did not see any conflict of interest that arose during the course of his representation because he represented McKnight first and completed the direct appeal prior to representing the petitioner."

The second habeas court concluded that "the petitioner has failed to show that there was a conflict of interest that precluded [Gallucci] from representing the petitioner. There is no evidence that there was any linkage between the McKnight case and the petitioner's case, nor is there any evidence showing that the shells were fired from the same weapon.[16] While the petitioner's allegations of ineffective assistance have now broadened to include habeas appellate counsel, the evidence is no greater than that presented to the first habeas court. . . . [T]he Appellate Court's review of this claim to determine whether the prior habeas court abused its discretion entailed review of this claim, the facts presented in support thereof, as well as the habeas court's legal conclusions.[17] Accordingly, this basis of ineffective assistance by [Trainer] also must fail." (Footnotes added.)

On appeal, the petitioner argues that Trainer failed to adequately brief the claim that Gallucci "could not have investigated McKnight because to do so would have violated his duty under the Rules of Professional Conduct, Rule 1.7." Due to this purported inability to conduct an investigation, the petitioner claims, Gallucci failed to provide effective representation.

Although it is not clear to us how rule 1.7 of the Rules of Professional Conduct[18] prohibits an investigation of the type described by the petitioner, we conclude nonetheless that the issue of whether Gallucci labored under a conflict of interest is not "debatable among jurists of reason . . . ." (Internal quotation marks omitted.) *Griffin* v. *Commissioner of Correction*, supra, 119 Conn. App. 242. The second habeas court found credible Gallucci's testimony that McKnight had no involvement in the shooting for which the petitioner and Robertson were prosecuted and that he saw no link between the two cases aside from the petitioner knowing McKnight, and would have sought removal from the petitioner's case had he observed any link. Gallucci further indi-

cated that the petitioner did not advise him that McKnight was or could have been the shooter. Our review of the record reveals nothing to disturb these findings.[19] We must therefore conclude that Gallucci did not "actively [represent] conflicting interests . . . ." (Internal quotation marks omitted.) *Hedge* v. *Commissioner of Correction*, supra, 152 Conn. App. 51. In other words, the petitioner cannot prevail on this claim because he has not progressed beyond a "mere theoretical division of loyalties"; (internal quotation marks omitted) *Santiago* v. *Commissioner of Correction*, 87 Conn. App. 568, 589, 867 A.2d 70, cert. denied, 273 Conn. 930, 873 A.2d 997 (2005); and has failed to point to specific instances in the record that suggest compromise of his interests for the benefit of McKnight.[20] Although it was established that the same gun was used in both crimes, the record fails to support the existence of an actual conflict of interest because no other evidence suggests a connection between the two crimes. Even if Gallucci had explored the possibility that McKnight was somehow involved in the shooting for which the petitioner was on trial, nothing in the record supports the theory that further investigation would have disclosed information supporting such conjecture.[21]

Finally, we note that Trainer's appellate brief squarely and extensively addressed the conflict of interest issue.[22]

Accordingly, with respect to this claim, the petitioner has not "demonstrate[d] that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." (Internal quotation marks omitted.) *Griffin* v. *Commissioner of Correction*, supra, 119 Conn. App. 242. We therefore conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] General Statutes § 52-470 (g) provides: "No appeal from the judgment rendered in a habeas corpus proceeding brought by or on behalf of a person who has been convicted of a crime in order to obtain such person's release may be taken unless the appellant, within ten days after the case is decided, petitions the judge before whom the case was tried or, if such judge is unavailable, a judge of the Superior Court designated by the Chief Court Administrator, to certify that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies."

[2] "A joint trial expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called to testify only once. . . . [W]here proof of the charges against the defendants is dependent upon the same evidence and alleged acts . . . severance should not be granted except for the most cogent reasons." (Citation omitted; internal quotation marks omitted.) *State* v. *Robertson*, 254 Conn. 739, 765,

760 A.2d 82 (2000).

[3] "Robertson also moved for severance on the ground that certain statements made by the [petitioner] concerning the shooting were admissible only against the [petitioner] and would cause him substantial prejudice. The trial court, however, determined that such statements were admissible against both the [petitioner] and Robertson, and therefore, concluded that Robertson was not entitled to severance on that ground." (Emphasis omitted.) *State* v. *Bush*, supra, 249 Conn. 426 n.4.

[4] "On several occasions during the trial, Robertson renewed his motion for severance on the ground that certain additional statements made by the [petitioner] were not admissible against him and caused him undue prejudice. The trial court determined that, although those additional statements were not admissible against Robertson, they were not unduly prejudicial, and therefore, Robertson was not entitled to severance on that ground." (Emphasis omitted.) *State* v. *Bush*, supra, 249 Conn. 427 n.5.

[5] There also was testimony by Johnson, who had witnessed the shooting and, approximately one year later, gave a statement to the police. In his statement, which was admitted at the criminal trial as an exhibit under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), he indicated that he knew the petitioner and knew Robertson by his street name, "Dulla," and that he saw Robertson fire one shot into the air and the petitioner fire the rest of the shots, killing the victim. During the criminal trial, however, he testified that everything in his statement to the police with respect to Robertson and the petitioner had been a lie and that the shooters, who both held their guns straight out and fired at the victim, had masks on, and that he did not recognize them. He also indicated that he could not tell how many shots each of the shooters had fired. During closing arguments, the primary focus of Hopkins' references to Johnson was that neither Johnson's testimony nor his statement was reliable, that he probably was not even at the scene at the time of the shooting, and that he had fabricated it all in order to obtain favorable treatment from the prosecution in his own criminal cases. The petitioner cites to only one brief portion of Hopkins' closing argument that references Johnson's statement that Robertson shot into the air in support of the petitioner's claim that his and Robertson's defenses were antagonistic. The petitioner fails to mention that Johnson's inconsistent statements were exploited significantly by Hopkins and Gallucci to buttress the petitioner's and Robertson's defenses that they were not present at the time of the shooting.

[6] The record of the criminal trial does not reveal whether the jury found the petitioner guilty of murder as a principal or an accessory, or whether it found Robertson guilty of murder as a principal or an accessory. There was some evidence, however, through the testimony of Johnson, that both the petitioner and Robertson fired shots in the direction of the victim, and the court instructed the jury that "[a] defendant would be guilty of murder if the injury is caused by the shooting of the victim, even though it was not the defendant's gunshot but that of another with whom he is acting in concert that caused the death of [the victim]. It is of no consequence that the evidence may not clearly establish that the death of [the victim] was caused by [the petitioner] or [Robertson], or an accomplice, one to the other . . . . If you are not satisfied beyond a reasonable doubt that [the petitioner] personally . . . participated in the murder, you must consider whether he intentionally aided or abetted some other person in the commission of the murder in question. The same applies to [Robertson]." Ultimately, our Supreme Court, on the basis of its review of the facts presented to the jury, determined that the petitioner was convicted of murder; see *State* v. *Bush*, supra, 249 Conn. 424; and Robertson was convicted of murder as an accessory. See *State* v. *Robertson*, 254 Conn. 739, 740, 760 A.2d 82 (2000).

[7] The operative petition in the first habeas trial was the petitioner's amended petition, dated October 7, 2003.

[8] The claim against Gallucci was limited to his capacity as trial counsel. The respondent filed a special defense that the third count of the petition, alleging ineffective assistance by Gallucci, should be barred as a successive petition. In its memorandum of decision, the second habeas court ruled that all but one claim in the third count had been abandoned, and that the remaining claim constituted a successive petition.

[9] Our Supreme Court, in concluding that the trial court properly denied Robertson's motion for severance, "decline[d] to hold that a separate trial is necessary whenever any potentially incriminating evidence against one codefendant is introduced during a joint trial." (Internal quotation marks

omitted.) *State* v. *Robertson*, supra, 254 Conn. 768. In doing so, it considered the trial court's numerous instructions to the jury to consider the cases against the petitioner and Robertson independently, as well as Robertson's failure to prove that he suffered substantial injustice as a result of the joint trial. Id.

[10] The petitioner also argues that Gallucci performed deficiently in not moving to sever the trials because the joint trial resulted in the admittance of evidence of a tattoo on Robertson's arm displaying the words "Bush Mob" and a picture of a fist holding a gun. This "highly prejudicial" evidence would not have been admitted, the petitioner argues, had he and Robertson been tried separately. Although, in separate counts in his amended petition in the second habeas trial, the petitioner did fault Wicker and Gallucci for, respectively, failing to properly brief the issue and for not objecting to the introduction of such evidence—claims that were later abandoned in the petitioner's posttrial brief—the petitioner did not raise a similar claim in his petition with respect to Trainer, whose performance as prior appellate counsel is the sole issue in this appeal. We also note that, although the issue of the tattoo was discussed in testimony during the second habeas trial, the second habeas court did not address the issue in its memorandum of decision. Therefore, as the petitioner did not raise this distinct claim in his petition, nor was it addressed by the second habeas court, we decline to review it. See *Henderson* v. *Commissioner of Correction*, 129 Conn. App. 188, 197–98, 19 A.3d 705 ("A petition for a writ of habeas corpus must set forth specific grounds for the issuance of the writ. Practice Book § 23-22 [1] specifically provides that the petition shall state the specific facts upon which each specific claim of illegal confinement is based and the relief requested . . . . A reviewing court will not consider claims not raised in the habeas petition or decided by the habeas court." [Citation omitted; internal quotation marks omitted.]), cert. denied, 303 Conn. 901, 31 A.3d 1177 (2011); see also *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 232, 828 A.2d 64 (2003) ("It is well established that [i]t is the appellant's burden to provide an adequate record for review. . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter. . . . In the absence of any such attempts, we decline to review this issue." [Internal quotation marks omitted.]).

[11] Trainer argued in her appellate brief that "the [first habeas] court accepts [Gallucci's] explanation that his failure to move for severance was strictly strategy. . . . However, as the petitioner points out in his testimony, certain [in]culpatory evidence was admitted at trial, which wouldn't have come in, had it not been for [Robertson]. . . . As such, there was ample reason to move for severance. Most importantly, such a motion would have preserved the issue for appeal. [Gallucci] explains his actions by stating that the court and the jurors were impatient with cocounsel's severance requests. One offer of motion would have preserved the issue. . . . There was probably very little chance that a motion by the petitioner for severance would have been granted. The habeas court consistently denied [Robertson's] motions for severance. Petitioner's counsel only had to request once to preserve the issue. It is unreasonable to think that one motion would have caused such a problem with the court and the jury. By his failure to move, [Gallucci] has severely prejudiced the petitioner's future appellate success." (Citations omitted.)

[12] Trainer argued that "[t]he court states that, even if [Gallucci's] actions amounted to ineffective assistance, his actions did not cause prejudice to the petitioner's case and therefore did not satisfy the second prong of *Strickland*. . . . In support of this conclusion, the court points to the appeal taken by [Robertson] in which the issue of severance was raised and denied by [our Supreme] Court. . . . The court assumes that an appeal by the petitioner would also fail. . . . Petitioner's attorney, Attorney Wicker, correctly responds that the court cannot support that analogy because the petitioner's appeal probably would have been far stronger than [Robertson's] and potentially raise[d] totally different issues. . . . However, the court adopts [Gallucci's] reasoning that his actions were tactical and dismisses the petitioner's claim." (Citations omitted.)

[13] Trainer argued that "[Robertson's] attorney raised questions that harmed the petitioner in an effort to assist [Robertson]."

[14] To be sure, the petitioner argues that the evidence of Robertson's "Bush Mob" tattoo; see footnote 10 of this opinion; would not have been admitted against the petitioner had the trials been severed, and that such evidence was prejudicial to him. However, for the reasons set forth in footnote 10 of this opinion, we decline to review the merits of this claim. We do note, though, that according to Gallucci's testimony in the second habeas trial,

the tattoo was far from the only evidence suggesting that the petitioner was a member of a gang. Gallucci testified: "[T]here had been so many references, even in the questions that were objected to, to Bush Mob, Bush Gang, Bush Gang, Bush Mob, that at some point everybody was going to be aware of the fact . . . ."

[15] In this court's per curiam decision dismissing the prior habeas appeal, it stated: "In dismissing the habeas petition, the [first habeas] court determined that the petitioner had failed to prove that there was any conflict of interest. The [first habeas] court also found that the petitioner had failed to establish that his counsel was deficient or that the petitioner was consequently prejudiced, in failing to renew the motion for severance of the petitioner's case from that of the [Robertson] because, in the absence of antagonistic defenses between the defendants, there was no basis for a severance. . . . After a careful review of the record and briefs, we conclude that the petitioner has not demonstrated that the issues he raises are debatable among jurists of reason, that a court could resolve the issues in a different manner or that the questions raised deserve encouragement to proceed further." (Citations omitted.) *Bush* v. *Commissioner of Correction*, supra, 92 Conn. App. 539–40. One of the major problems with the petitioner's claims is that this court has already rejected the claim that severance was warranted or that Gallucci had a conflict of interest. The petitioner seemingly argues that, in reviewing the first habeas appeal, this court presumably relied on only whatever arguments were set forth in Trainer's brief. The petitioner fails to acknowledge that, in resolving the severance and conflict of interest claims presented, the reviewing court would also consider the entire record, including the decision of the first habeas court and the arguments set forth in the state's brief. See *Alterisi* v. *Commissioner of Correction*, supra, 145 Conn. App. 223 (plenary review of whether facts found amounted to ineffective assistance of counsel).

[16] There actually was uncontroverted evidence presented at the petitioner's criminal trial that the same gun was used in both the murder for which McKnight was charged and the subsequent murder for which the petitioner and Robertson were charged. During-cross examination, Hopkins elicited the testimony of James Stephenson, a criminalist firearms and tool mark examiner employed by the Connecticut State Police, who testified that he had compared eight cartridge casings relating to McKnight's case with eight of the nine cartridge casings in evidence in the petitioner's case, and had determined that all sixteen cartridges had been fired from the same gun. Although it does not affect our resolution of this claim, we nonetheless conclude that the second habeas court's factual finding that there was no evidence that the same gun had been used in both murders is clearly erroneous.

[17] See footnote 15 of this opinion.

[18] Rule 1.7 of the Rules of Professional Conduct provides:

"(a) Except as provided in subsection (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under subsection (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or the same proceeding before any tribunal; and

(4) each affected client gives informed consent, confirmed in writing."

[19] At most, the record reflects a *potential* connection between the cases, as detailed herein, but such potential is not a sufficient basis for disturbing the second habeas court's ruling. In addition to the testimony of Stephenson contained in the transcript of the criminal trial, which was a full exhibit in the second habeas trial; see footnote 16 of this opinion; Wicker, in his testimony to the second habeas court, stated that it was his recollection that the same weapon was used in both the McKnight case and the petitioner's case, but that "[t]he weapon was the only issue [he] recall[ed] of commonality . . . ." Gallucci testified in the second habeas trial that he

"remember[ed] there was a ballistics report that . . . purportedly linked the weapon to the shooting [involving McKnight] . . . but I don't remember as I'm sitting here if it actually was testified to because it was a lot of off-the-record stuff . . . ." Gallucci further stated that "I don't take everything [firearms examiners] say for gospel . . . but even assuming it was the same gun and that was correct, I didn't see the link because [McKnight] had nothing to do with our case."

[20] We note that pursuing a third-party culpability defense based on only the commonality of the gun used in fact may have been to the detriment of the petitioner because, as Gallucci explained in the second habeas trial, it could have served to connect the petitioner to a "stash house" through which guns were shared, or even to the crime of which McKnight was convicted.

[21] "[I]n explaining the requirement that the proffered evidence [in support of a third-party culpability defense] establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, we have stated: Such evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt. . . . In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination." (Citation omitted; internal quotation marks omitted.) *State* v. *Arroyo*, 284 Conn. 597, 609–10, 935 A.2d 975 (2007).

[22] In her appellate brief, Trainer claimed that evidence introduced at the criminal trial showed that the same gun was used in both murders and that, because of his impaired loyalty, Gallucci was unable to introduce evidence that McKnight was already convicted for a murder in which the same gun was used. Trainer also argued that "[j]oint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing. . . . For example, in the current [case], the conflict of interest clearly could have precluded [Gallucci] from exploring alternative defenses or from seeking consideration from the state for his client. . . . Because the petitioner has shown that his attorney had an actual conflict of interest, which adversely affected his representation, the court should reverse the judgment of the habeas court . . . ." (Citation omitted.)

---